## THE AUGUSTINE. THE BISMARCK. THE IMPERATOR (now BERENGARIA).

(District Court, S. D. New York. March 14, 1924.)

**1. Admiralty ⊛65—Exceptions to libel admit facts well pleaded.**

Exceptions to libel admit facts well pleaded.

**2. Collision ⊛125—Evidence held to show that steamship was owned by British government at time of collision.**

Evidence *held* to show that steamship was owned by British government and operated by agent company at time of collision.

**3. Shipping ⊛24—Mere sale and delivery of vessel is enough to confer title.**

Mere sale and delivery is enough to confer title to steamship; documentation and bills of sale and registration being for purpose of fixing vessel's status and to give notice to purchasers and mortgagees.

**4. International law ⊛10—Exceptions sustained to defense that vessel owned by British government at time of collision was immune from arrest.**

In libel against vessel, which was owned by British government at time of collision with scow, but later sold, exceptions to part of defense, asserting that vessel was immune from arrest, will be sustained; such immunity being a privilege personal to sovereign.

**5. International law ⊛10—Vessel owned by British government at time of collision held not subject to maritime lien enforceable after sale.**

Vessel owned by British government at time of collision with scow *held* not subject to maritime lien for damages which could be enforced on sale to private company.

**6. Collision ⊛100(2)—Navigable waters ⊛14(3)—Tug, with scows in tow, held at fault in failing to give fog signal to approaching vessel and liable for damages to scow and for penalty for dumping of scow within forbidden limits.**

Tug having two loaded scows in tow, and failing to give fog signal to approaching steamship, as required by Inland Regulations June 7, 1897, art. 15 (Comp. St. § 7888), *held* at fault and liable for damages to scow from resulting collision, and liable, together with scow, under Act June 29, 1888, § 3, as amended by Act Aug. 18, 1894, § 3, and Act May 28, 1908, § 8 (Comp. St. § 9935), and section 4 (section 9937), to the United States for penalty for dumping of scow within forbidden limits.

In Admiralty. Two libels, one by the City of New York, as owner of scow D. S. C. No. 5, against the steam tugs Augustine and Bismarck and the steamship Imperator, now the Berengaria; the other by the United States against the steam tug Augustine and the dumper scow D. S. C. No. 5. In the first libel, decree against the steam tug Augustine, and libel against the tug Bismarck

and the steamship Berengaria dismissed. In second libel, decree for libelant.

William Hayward, U. S. Atty., of New York City (Ralph B. Romaine, of New York City, of counsel), for the United States.

Charles J. Carroll, Asst. Corp. Counsel, of Brooklyn, N. Y., for City of New York.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson, of New York City), for the Augustine.

Lord, Day & Lord, of New York City (Allan B. A. Bradley and George De Forest Lord, both of New York City), for Cunard S. S. Co.

Foley & Martin, of New York City (William J. Martin, of New York City), for the Bismarck.

WARD, Circuit Judge. These cases were tried together.

## First Case.

August 4, 1920, the United States filed a libel of information against the steam tug Augustine and the scow D. S. C. No. 5, under section 3 of the Act of June 29, 1888, c. 496 (25 Stat. L. 209), as amended by the Act of August 18, 1894 (28 Stat. L. 360, § 3), and the Act of May 28, 1908 (35 Stat. L. 426, § 8 [Comp. St. § 9935]). The second paragraph of section 3 concludes with this sentence:

"* * * And, further, neither defect in machinery nor avoidable accidents to scows or towboats, nor unfavorable weather, nor improper handling or moving of scows or boats of any kind whatsoever shall operate to release the owners and master and employees of scows and towboats from the penalties hereinbefore mentioned."

Section 4 (Comp. St. § 9937) provides:

"* * * Any boat or vessel used or employed in violating any provision of this act, shall be liable to the pecuniary penalties imposed thereby, and may be proceeded against, summarily by way of libel in any District Court of the United States, having jurisdiction thereof."

November 18, 1920, the city of New York, claimant of the scow No. 5, brought in the Cunard Steamship Company, Limited, as owner of the Imperator, under the fifty-sixth rule in admiralty.

June 11, 1921, the Cunard Steamship Company answered the petition.

June 17, 1920, the tug Augustine, with two loaded dumpers, having turned back from Sandy Hook Lightship on account of the weather, was returning to New York.

The steamship Imperator was coming down the lower bay on her way to Liverpool. The bow of dumper No. 5 was in collision with the port bow of the Imperator, and, as water was coming in fast, the captain of the dumper emptied three of the forward pockets so as to bring her bow up out of the water and prevent her from sinking.

This happened within the forbidden limits, and, as I shall hold in the second case that the collision was due to the fault of the Augustine, it was an "avoidable accident" under section 3, and therefore the United States is entitled, under section 4, to collect a penalty from the tug Augustine or the scow No. 5 or both (The scow 6-s, 250 U. S. 269, 39 S. Ct. 452, 63 L. Ed. 977). I think one penalty in the minimum amount of $250 will be sufficient, and the libelant may take a decree for the amount against the claimant of the tug Augustine primarily and against the claimant of D. S. C. No. 5 secondarily.

## Second Case.

July 13, 1921, the city of New York filed a libel against the steam tug Augustine, the steamship Berengaria (formerly the Imperator) and the steam tug Bismarck to recover for damages to its scow D. S. C. No. 5.

March 13, 1923, the Cunard Steamship Company filed its answer, in which it set up a defense as follows:

"For a second separate and complete defense, claimant alleges upon information and belief:

"Eleventh: The said steamship Imperator, on the 17th day of June, 1920, when said collision is alleged in the libel herein to have occurred, was owned by his majesty, the King of Great Britain and Ireland, and by reason of said ownership was immune from arrest or seizure.

"Twelfth: Thereafter, and on or about the 25th day of February, 1921, prior to the filing of the libel herein, the said steamship Imperator was sold and transferred to the Cunard Steamship Company, Limited, the claimant herein.

"Thirteenth: By reason of the premises, no lien arose against said steamship Imperator on account of said collision."

[1] At the trial, the Southern Transportation Company, claimant of the tug Augustine, filed exceptions to this defense. Exceptions, like demurrers, admit facts well pleaded (The Schuylkill [D. C.] 249 F. 781; The Fred E. Sander [D. C.] 212 F. 545), in this case, for instance, the ownership of the Imperator by the British government at the time of collision, and raised

two questions of law: First, that she was immune from arrest; and, second, that she was not subject to a maritime lien. Still, as evidence of ownership was admitted at the trial over objection and exception of all parties, I will go into the subject fully. Jones, the staff captain of the Imperator, and Garlick, the operating manager of the Cunard Company, testified that she was bought by the British government from the Emergency Fleet Corporation and operated by the Cunard Steamship Company as its agent from November 21, 1919, to February, 1921; that the Cunard Company was paid a commission on the earnings and disbursements of the steamship until February, 1921, when she was bought by that company from the British government, and her name changed to Berengaria, and her port of registry changed from London to Liverpool. Overton, who joined the steamship in December, 1919, was junior third officer at the time of the collision, and still on her, stated that during this period—December, 1919, to February, 1921—she carried a certificate of the Board of Trade, stating that the British Ministry was the owner and the Cunard Steamship Company manager, also that the ship's articles from voyage to voyage described the British Ministry of Shipping as owner.

[2, 3] If the terms of the contract of sale between the Emergency Fleet Corporation and the Cunard Company or of the contract of operation between the Cunard Company and the British government or of the contract of sale from the British government to the Cunard Company were involved, or if the question raised were whether the steamship was entitled to the privileges of a British vessel, more detailed evidence and different evidence would have been required. But the mere fact of ownership can be proved by the course of dealing, and I think the evidence was sufficient to show that the British government did own the steamship, and that the Cunard Company operated her for the government in the freight and passenger business between November 21, 1919, and February, 1921, and that then the company bought her and has operated her itself ever since, on its own account, in its own line. A ship is a piece of personal property, just like a carriage or a locomotive, and ownership may be proved by such evidence as the foregoing. Mere sale and delivery is enough to confer title. Documentation is for the purpose of fixing the status of a vessel as of the state whose flag she flies; and bills of sale and registration

8 F.(2d)—19

are for the purpose of giving notice to purchasers and mortgagees of the record of title.

[4] I find that the Imperator was the property of the British government at the time of collision, not only because admitted by the exception, but as proved at the trial. If she had been arrested, that government could have appeared, made the jurisdictional objection, and the court would have disposed of it on the proofs, or, if it preferred not to appear in the cause, it could have raised the question as a political one through our State Department. Ex parte Muir, 254 U. S. 522, 41 S. Ct. 185, 65 L. Ed. 383; S. S. Gul Djemal v. Campbell, Stuart & Co., 264 U. S. 90, 44 S. Ct. 244, 68 L. Ed. 574, 1924 A. M. C. 434. If those facts had been established, she would have been released, whether at fault or not. The Carlo Poma (C. C. A.) 259 F. 369. But that exemption from arrest arises out of comity between sovereigns. It is a personal privilege of the sovereign, and, if not claimed, the vessel proceeded against in rem and found at fault would be condemned and sold in the usual course. In this case the British government did not and does not make any such request. Therefore the exception, so far as it applies to that part of the defense which asserts that the Imperator was immune from arrest, is sustained.

But the defense that the Imperator was not subject to a maritime lien because of the collision is not procedural but substantive. The case of The Western Maid, 257 U. S. 419, 42 S. Ct. 159, 66 L. Ed. 299, is relied on. It involved three separate steamers in collision, viz. the Western Maid, the property of the United States government, and the Liberty and the Carolinian, privately owned. Under section 9 of the Act of September 7, 1916 (Comp. St. § 8146e), the Western Maid was liable if employed as a merchant vessel. The government took the objection that she was operated for government purposes, and the court so held. Of course, if no objection had been made, the cause would have followed the ordinary course. On the other hand, the Liberty and the Carolinian, the other two vessels, though privately owned, were at the time of collision being operated under bare boat charters by the United States for government purposes. Libels in rem were filed against them after they had been returned to their owners and the government, under the Transportation Act of March 9, 1920, § 4 (41 Stat. 525 [Comp. St. Ann. Supp. 1923, § 1251¼c]), intervened and set up the de-

fense. The Supreme Court held that a lien which could not be enforced was as nonexistent as a ghost, while the dissenting judges held, that the lien existed at the time of the collision, and, although not enforceable because the vessels were being operated by the government for public purposes, it was merely suspended 'and became enforceable when the vessels were returned to their owners. Mr. Justice Holmes, delivering the opinion of the court, said:

"But it is said that the decisions have recognized that an obligation is created in the case before us. Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp."

Mr. Justice McKenna, who delivered the dissenting opinion, speaking of our maritime law, said:

"The most prominent and efficient of its remedies is that which subjects its instrumentalities, its ships particularly, to judgment. Personality is assigned to them and they are considered in pledge to indemnify any damage inflicted through them. They are made offenders and have the responsibility of offenders, and the remedy is suited to the purpose. In Rounds v. Cloverport Foundry & Machine Co., 237 U. S. 303, 306 [35 S. Ct. 596, 59 L. Ed. 966], it is said, Mr. Justice Hughes, delivering the opinion of the court, 'The proceeding in rem which is within the exclusive jurisdiction of admiralty is one essentially against the vessel itself as the debtor or offending thing—in which the vessel is itself "seized and impleaded as the defendant, and is judged and sentenced accordingly." ' "

It is interesting to note that in the case of The Tervaete, 16 Asp. Mar. Law Cas. 48, Sir Henry Duke in the lower court took the same view as the dissenting judges in the case of The Western Maid, holding that a vessel owned and operated by the Belgian government at the time of collision, and subsequently sold to private owners, was subject to an enforceable maritime lien in their hands, while on appeal the Court of Appeals came to the same conclusion as did the majority of the court, viz. that no maritime lien existed at all.

Under the opinion of the court in The Western Maid, there would be in this case no lien upon the Berengaria, even if the British government had been at fault for the collision. The views of the dissenting judges, on the other hand, would sustain a lien upon her in the hands of the Cunard Company as purchaser if the British government were at fault for the collision.

[5] The difference appears to be as to the ground upon which a vessel is personalized by our maritime law. The Court of Appeals in The Tervaete and the Supreme Court in The Western Maid regarded a vessel as liable in rem or as, so to speak, personalized, only if her owners or owners pro hac vice, or the persons lawfully in charge of her, were liable. On the other hand, Sir Henry Duke in The Tervaete, and the dissenting judges in The Western Maid, seem to regard the vessel as subject to a lien exactly as if she were a person committing the fault. I suppose this theory would not be carried so far as to hold that, if a moored vessel with no crew on board were maliciously set adrift and so brought into collision with another vessel, she would be subject to a lien for the damage. If not, should a vessel be held as a person liable for a fault for which her owners or operators who committed it were not personally liable? The exception is overruled as to this defense, and the steamship is held not subject to a maritime lien because of the collision on the authority of The Western Maid, supra.

[6] We come now to the merits as between the scow D. S. C. No. 5, the tug Augustine, and the tug Bismarck.

The Imperator, bound down the lower bay of New York on her way to Liverpool, saw the tug Bismarck with a tandem tow of two light dumpers approaching practically head on.

There is a dispute as to whether the Bismarck or the Imperator blew the first signal, but a port to port passing was finally made, and this was the right course under article 18, rule 1, of the Inland Regulations of June 7, 1897 (Comp. St. § 7892). To accomplish it more safely, the Imperator ported, and the Bismarck, which was then under a starboard helm, in accordance with her signal of two blasts, and had no time to port, put her helm hard astarboard and made a complete circle round and over her own hawser. The vessels passed with a clearance of from 400 to 500 feet.

To give the Imperator more room, the Augustine starboarded, heading northwest, which was the course she and the Bismarck originally intended to take. There was no exchange of signals between the Augustine and the Imperator. The Augustine was just astern of the last boat of the Bismarck's tow, and their courses were parallel and about 300 feet apart. If the Imperator had not ported when the Augustine starboard-

ed, or if the Augustine had not starboarded when the Imperator ported, I think there would have been no collision.

The tide was flood. The Augustine and her tow were in a heavy rain squall, which went suddenly across the channel, lasting from 15 to 20 minutes and which the Imperator did not reach until about the moment of the collision. It prevented the Imperator from seeing the tow of the Augustine when she did see the Augustine heading northwest. On the other hand, the large and very high Imperator was visible to the Augustine. It was a situation in which I think the Augustine was under the duty of blowing a fog signal of one prolonged blast followed by two short blasts (article 15 of the Inland Regulations of June 7, 1897 [Comp. St. § 7888]), to advise the Imperator that she had a tow.

When the Imperator did discover the Augustine's long tow, the only possible way of avoiding it was by stopping and backing full speed astern, which she did. Had she gone either to starboard or to port I think she would have collided with the tug or with the tow at some point further aft or further forward of the point where she struck the tug's hawser. If the Augustine had complied with article 15, the collision would have been, or at least might have been, prevented, and she was therefore at fault and liable.

The tug Bismarck had passed beyond the point where the collision took place, was not involved in it in any way, and was not at fault.

The master of scow D. S. C. No. 5 dumped his forward pockets, in the emergency caused by the fault of the Augustine, to save his boat from sinking, and she was not at fault.

The libelant may take the usual interlocutory decree against the claimant of the tug Augustine, and the libel against the Berengaria and the tug Bismarck will be dismissed.