## SWISS NATIONAL INSURANCE COMPANY, LIMITED *v.* THOMAS W. MILLER, AS ALIEN PROPERTY CUSTODIAN, AND FRANK WHITE, AS TREASURER OF THE UNITED STATES.

### APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 132. Argued November 18, 1924.—Decided February 2, 1925.

1. Where a corporation was an "enemy" within the definition of
   the Trading with the Enemy Act because doing business in Ger-
   many, the enemy status of its property then seized in this country
   was not changed by a subsequent cessation of such business.
   P. 44.
2. The fact that an enemy corporation ceased to be an enemy when
   the war was ended by the Joint Resolution of July 2, 1921, did not
   entitle it to a return of its seized property; for, by § 12 of the
   Trading with the Enemy Act, such claims were to be settled by
   future direction of Congress. *Id.*
3. Clause 1 of § 9–b of the Trading with the Enemy Act, as amended
   June 5, 1920, c. 241, 41 Stat. 977, which provides for return of
   seized enemy property whose owner was and remains a "citizen
   or subject" of a nation other than Germany, Austria, Hungary or
   Austria Hungary, cannot be construed as including corporations.
   So *held* in view of the use of "citizen or subject" in other clauses
   of the section relating only to natural persons, and more particu-
   larly because the 6th clause of the same section makes a special
   classification of partnerships, associations and corporations, allow-
   ing return of property if they were and remain entirely owned
   by subjects or citizens of nations other than those above men-
   tioned. P. 45.
4. Whether the terms "citizen or subject" are broad enough to
   include corporations depends upon the intent to be gathered from
   the legislation in which they occur. P. 46.

5. Clause 11 of § 9-b of the Trading with the Enemy Act, added
   by the amendment of March 4, 1923, c. 285, 42 Stat. 1511, amounts
   to a legislative construction of clause 1, as above construed.  P. 48.
53 App. D. C. 173 (289 Fed. 571) affirmed.

APPEAL from a decree of the Court of Appeals of the
District of Columbia affirming a decree of the Supreme
Court of the District which dismissed the appellant's bill
against the Alien Property Custodian and the Treasurer
of the United States, to recover securities seized and held
under the Trading with the Enemy Act.

*Mr. Hoke Smith,* for appellant.

*Mr. Merrill E. Otis,* Special Assistant to the Attorney
General, with whom *Mr. Solicitor General Beck* was on
the brief, for appellees.

MR. CHIEF JUSTICE TAFT delivered the opinion of the
Court.

This is an appeal from the Court of Appeals of the
District of Columbia under Section 250 of the Judicial
Code.

The Swiss National Insurance Company filed a bill in
equity against the Alien Property Custodian and the
Treasurer of the United States in the Supreme Court of
the District to recover securities to the value of about one
million dollars.  These it had before the War deposited
in the various state treasuries, because required by the
state laws as a condition of doing insurance therein.  The
Alien Property Custodian had seized them in November,
1918, as property of an enemy, under the definition of
Section 2, par. (a) of the Trading with the Enemy Act,
approved October 6, 1917, c. 106, 40 Stat. L. 411, that the
word " enemy " should be deemed to mean and include
for the purpose of the Act " any . . . corporations incor-
porated within any country other than the United States
and doing business within " the " territory (including

that occupied by the military and naval forces) of any·
nation with which the United States is at war." The
plaintiff's petition admitted that at the time of the seizure
the plaintiff was doing business in Germany, and was then
an enemy of the United States under the definition, and
that the seizure was lawful. It is further conceded in
argument that the stock of the plaintiff corporation was
largely held by Germans, and a failure to aver the con-
trary in the petition makes this fact a part of the case on
the motion of defendants to dismiss the bill.

The grounds stated in the bill for its recovery of the
securities were threefold—first, that since the seizure the
company had ceased to do business in Germany; second,
that the war had been officially declared ended, and, third,
that by virtue of the amendment of the Trading with the
Enemy Act, approved June 5, 1920, c. 241, 41 Stat. 977,
the plaintiff became expressly entitled to the recovery
sought.

The motion of defendants was granted, and the bill
dismissed. The decree of the District Supreme Court
was affirmed by the District Court of Appeals.

The first contention, that because the company had
ceased to do business in Germany after the seizure the
Alien Property Custodian lost his right to continue to
hold the property, can not be sustained. A change like
this could not take away the status of the seized property
as enemy property. The withdrawal from business in
Germany might well involve a transfer of something of
value from the plaintiff to enemy citizens or subjects and
strengthen the enemy resources.

Second, it is argued that as the War ended by Joint
Resolution of July 2, 1921, 42 Stat. 105, the plaintiff
thereby ceased to be an enemy and was entitled to a
return of its property without express legislation giving
such a right. It is clear from Section 12 of the Trading
with the Enemy Act, 40 Stat. 411, 424, that Congress did

not intend that such a right should exist. One clause of that section provides:

"After the end of the War any claim of any enemy or of an ally of enemy to any money or other property received and held by the Alien Property Custodian or deposited in the United States Treasury, shall be settled as Congress shall direct."

The argument for the appellant is that when the War ended, it ceased to be an enemy and so the words quoted do not apply to it. This is an impossible construction of the section. After the end of the War, there could be no enemy in the sense in which the appellant argues. The word "enemy" used in Section 12 of course refers to the person who or corporation which fulfilled the definition of an enemy during the war. It follows that the right of the appellant to recover its property must depend on the Congressional direction subsequent to the original Act. This brings us then to the amendment to the Trading with the Enemy Act of June 5, 1920, 41 Stat. 977.

The third argument of the appellant is then directed to the question whether the appellant comes within the classes of enemies given the right to recover their property from the Alien Property Custodian by the 1920 amendment. Section 9, paragraph a, of that amendment provides for a return by order of the President to a person not an enemy claiming an interest in property seized by the Custodian, and, failing such order, allows a suit in equity to recover the property or money due. Par. b gives a similar opportunity to anyone who is the owner of property seized and held by the Custodian, if the President finds the owner to have been in one of eight defined classes at the time of the seizure. The first class among these is:

"A citizen or subject of any nation or State or free city other than Germany or Austria or Hungary or Austria-Hungary, and [who] is at the time of the return

of such money or other property hereunder a citizen or subject of any such nation or State or free city".

The sixth class is this:

" A partnership, association, or other unincorporated body of individuals outside the United States, or a corporation incorporated within any country other than the United States, and [which] was entirely owned at such time by subjects or citizens of nations, States or free cities other than Germany or Austria or Hungary or Austria-Hungary and is so owned at the time of the return of its money or other property hereunder."

It is urged for appellant that it is a citizen of Switzerland and is thus included with those favored in the first class. Section 2 of the original Trading with the Enemy Act approved October 6, 1917, c. 106, 40 Stat. 411, and unrepealed provides that: " The word ' person ' as used herein shall be deemed to mean an individual, partnership, association, company or other unincorporated body of individuals, or corporation or body politic" and the word " enemy " is declared to be equally inclusive. But there is in the Act and its amendments no such definition of the words citizen or subject. The term citizen or subject may be broad enough to include corporations of the country whose citizens are in question. *Paul* v. *Virginia,* 8 Wall. 168; *Selover* v. *Walsh,* 226 U. S. 112; *Western Turf Association* v. *Greensburg,* 204 U. S. 359. Whether it is so inclusive in any particular instance depends upon the intent to be gathered from the context and the general purpose of the whole legislation in which it occurs. *United States* v. *Northwestern Express Co.,* 164 U. S. 686, 689. The first clause of paragraph b refers to a citizen or subject who may change his nationality which could hardly refer to a corporation. The second and third clauses describing the 2nd and 3rd classes refer to married women and obviously the term citizen or subject in them includes only natural persons. Clause 4

concerns a citizen or subject of Germany accredited to the United States as the wife or child of a diplomatic officer, of course, a natural person. Clause 5 describes a citizen or subject transferred after arrest to the custody of the War Department evidently only a natural person. In clause 6, the subjects or citizens therein referred to are the owners of partnerships, associations or incorporated bodies indicating that they, too, are natural persons. The context would, therefore, seem to show that the words are not used in the paragraph to include more than individuals. Where, as in the amendment to Section 9 of the year before, July 11, 1919, c. 6, 41 Stat. 35, a proviso was intended to include individuals and corporations, the word persons is used in connection with the words citizens or subjects and thus no doubt is left of the inclusive effect of the proviso. The foregoing inferences as to the narrower scope of the term citizen in paragraph b are not conclusive though they are persuasive.

But the strongest and to us the convincing argument that the language of clause 1 of par. b was not intended to include corporations is the especial mention of partnerships, associations and corporations in clause 6 as a different class from that of clause 1 of the same section. That class is partnerships, associations, corporations, who were enemies under the Act because of the business they did in Germany or Austria-Hungary, but whose owners as partners, associates or stockholders were not enemies either at the time of the sequestration or at the time of the return.

It was evidently intended by Section 9–b not to allow any individual enemies to be favored unless they as women only acquired their status as enemies because of marriage to a male enemy, or unless they were diplomatic representatives of the enemy countries, or members of their families, and the property involved was within

the United States because of their diplomatic service, or unless they were enemies interned in the United States during the War and were living in the United States at the time of the return of their property. There was an obvious purpose to exclude all other individual Germans or Austrians from the privileges of the section and it was to carry out this exclusion that clause 6 was drafted to cover especially the subject of corporations, partnerships and associations in which Germans or Austrians should have no interest. It was of a piece with the subsequent provision of the 5th section of the Joint Resolution of July 2, 1921, ending the War (42 Stat. 105, 106, c. 40), designed to retain in custody the property of all German and Austrian nationals deposited with the Custodian in order to aid this country and its nationals in collecting claims for losses against the two enemy governments. The design was further subsequently revealed, though not so closely adhered to, in clause 11, added to Section 9, par. b, by the second amendment to the Trading with the Enemy Act (42 Stat. 1511, 1513, c. 285), by which property could be returned to non-German or non-Austrian corporations provided that Germans or Austrians did not own fifty per cent. of the stock.

Clause 11 of the second amendment was in fact a legislative construction of clause 1 of par. b of Section 9 in the amendment of 1920 as we construe it, because otherwise and according to the contention of the defendants, a non-German or non-Austrian corporation though doing business in Germany or Austria could, under clause 1 and without clause 11, recover its property whatever its stock ownership.

Had no clause 6 been inserted in the Act, possibly the words citizens or subjects of clause 1 might have been held to include corporations; but, with a specification of them as a separate class, it would violate an obviously sound rule to include them by construction in clause 1 also as citizens or subjects.

Much has been said in respect to the intent of Congress to be liberal in this series of acts as shown by the correspondence of the Attorney General and his subordinates with the Congressional Committees; but nothing has been called to our attention that seems to us to have real significance in respect to the exact point in this discussion.

In order to supply some reason or occasion for clause 6, if clause 1 is to be held to include corporations as citizens or subjects, it is suggested for appellants that the clause was intended to cover German and Austrian corporations entirely owned by citizens of the United States or of other countries than Germany or Austria. We think this a far fetched argument to explain the very general words of this clause when such a purpose might have been easily attained by specific provision for such exceptional instances. Under the appellant's construction of clause 6, the improbable overlapping duplication of clause 1 and clause 6 is so manifest that we think the construction must be rejected. We concur, therefore, with the conclusion of the Court of Appeals, and the District Supreme Court.

*Affirmed.*

Mr. JUSTICE McKENNA participated in the consideration of this case and concurred in the opinion prior to his resignation.

The separate opinion of Mr. JUSTICE McREYNOLDS.

This cause requires interpretation of Section 9, Trading with the Enemy Act, approved October 6, 1917, c. 106, 40 Stat. 411, 419, as amended by the Act of June 5, 1920, c. 241, 41 Stat. 977, copied below.*

---

* SEC. 9. (a) That any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, or to whom

Section 2 of the original Act, which has remained unchanged, declares—

" The word ' person,' as used herein, shall be deemed to mean an individual, partnership, association, company or other unincorporated body of individuals, or corporation or body politic; " and that the word " enemy " shall be deemed to mean—

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war [or an ally of such nation]; or resident outside the United

any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest therein to which the President shall determine said claimant is entitled: *Provided,* That no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title, or interest which he may have in such money or other property. If the President shall not so order within sixty days after the filing of such application or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of six months after the end of the war institute a suit in equity in the Supreme Court of the District of Columbia or in the district court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer,

States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war [or an ally of such nation] or incorporated within any country other than the United States and doing business within such territory. . . ."

For many years appellant has been incorporated under the laws of Switzerland. Prior to 1917 and continuously thereafter until 1922 it did an insurance business in Germany. From 1910 until November 18, 1918, it carried on the same business within several of our States, and as security for its obligations deposited many domestic

---

assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the court shall determine said claimant is entitled. If suit shall be so instituted, then such money or property shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this Act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant, or by the Alien Property Custodian, or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant or suit otherwise terminated.

(b) *In respect of all money* or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, if the President shall determine that the owner thereof, at the time such money or other property was required to be so conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or at the time when it was voluntarily delivered to him or was seized by him was—

(1) A citizen or subject of any nation or State or free city other than Germany or Austria or Hungary or Austria-Hungary, and is at the time of the return of such money or other property hereunder a citizen or subject of any such nation or State or free city; or

(2) A woman who at the time of her marriage was a subject or citizen of a nation which has remained neutral in the war or of a nation which was associated with the United States in the prosecu-

bonds—a million dollars. On the latter date—a week
after the armistice—the Alien Property Custodian took,
possession of these bonds, and either he or the Treasurer
of the United States now holds them. Claiming the se-
questered securities or their proceeds under Section 9,
Subsection (b), appellant began this proceeding in the
Supreme Court, District of Columbia, November 28, 1921.
That court held the corporation could not prevail because
subjects of Germany held some of its stock; and upon
motion dismissed the bill. The Court of Appeals affirmed
the decree. The corporation came within the term "en-
emy" solely because of its business within Germany; but

---

tion of said war, and who prior to April 6, 1917, intermarried with
a subject or citizen of Germany or Austria-Hungary and that the
money or other property concerned was not acquired by such woman
either directly or indirectly from any subject or citizen of Germany
or Austria-Hungary; or

(3) A woman who at the time of her marriage was a citizen of
the United States (said citizenship having been acquired by birth in
the United States), and who prior to April 6, 1917, intermarried with
a subject or citizen of Germany or Austria-Hungary and that the
money or other property concerned was not acquired by such woman
either directly or indirectly from any subject or citizen of Germany
or Austria-Hungary; or

(4) A citizen or subject of Germany or Austria or Hungary or
Austria-Hungary and was, at the time of the severance of diplomatic
relations between the United States and such nations, respectively,
accredited to the United States as a diplomatic or consular officer of
any such nation, or the wife or minor child of such officer, and that
the money or other property concerned was within the territory of
the United States by reason of the service of such officer in such
capacity; or

(5) A citizen or subject of Germany or Austria-Hungary, who by
virtue of the provisions of sections 4067, 4068, 4069, and 4070 of the
Revised Statutes, and of the proclamations and regulations there-
under, was transferred, after arrest, into the custody of the War
Department of the United States for detention during the war and
is at the time of the return of his money or other property hereunder
living within the United States; or

it is admitted that enemy subjects owned and controlled a majority of the capital stock. Apparently the sequestration was permissible—its propriety after cessation of hostilities is not for our determination.

As an incorporated citizen or subject of Switzerland appellant claims to come within Paragraph (1) of the amended Act—

"(1) A citizen or subject of any nation or State or free city other than Germany or Austria or Hungary or Austria-Hungary, and is at the time of the return of such money or other property hereunder a citizen or subject of any such nation or State or free city."

(6) A partnership, association, or other unincorporated body of individuals outside the United States, or a corporation incorporated within any country other than the United States, and was entirely owned at such time by subjects or citizens of nations, States, or free cities other than Germany or Austria or Hungary or Austria-Hungary and is so owned at the time of the return of its money or other property hereunder; or

(7) The Government of Bulgaria or Turkey, or any political or municipal subdivision thereof; or

(8) The Government of Germany or Austria or Hungary or Austria-Hungary, and that the money or other property concerned was the diplomatic or consular property of such Government. [Or]

(9) An individual who was at such time a citizen or subject of Germany, Austria, Hungary, or Austria-Hungary, or who is not a citizen or subject of any nation, State, or free city, and that such money or other property, or the proceeds thereof, if the same has been converted, does not exceed in value the sum of $10,000, or although exceeding in value the sum of $10,000 is nevertheless susceptible of division, and the part thereof to be returned hereunder does not exceed in value the sum of $10,000: *Provided,* That an individual shall not be entitled, under this paragraph, to the return of any money or other property owned by a partnership, association, unincorporated body of individuals, or corporation at the time it was conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, or seized by him hereunder; or

(10) A partnership, association, other unincorporated body of individuals, or corporation, and that it is not otherwise entitled to the

On the other hand the insistence is that although the words " citizen or subject " often include corporations as well as natural persons, this is not necessarily true but depends always upon the intent disclosed by context and other accompanying circumstances. Further, that although corporations would normally fall within the words of Paragraph (1), without more, the contrary intent is disclosed and they are excluded therefrom by the provisions touching certain corporations found in Paragraph (6)—

"A partnership, association, or other unincorporated body of individuals outside the United States, or a

---

return of its money or other property, or any part thereof, under this section, and that such money or other property, or the proceeds thereof, if the same has been converted, does not exceed in value the sum of $10,000, or although exceeding in value the sum of $10,000, is nevertheless susceptible of division, and the part thereof to be returned hereunder does not exceed in value the sum of $10,000: *Provided,* That no insurance partnership, association, or corporation, against which any claim or claims may be filed by any citizen of the United States with the Alien Property Custodian within sixty days after the time this paragraph takes effect, whether such claim appears to be barred by the statute of limitations or not, shall be entitled to avail itself of the provisions of this paragraph until such claim or claims are satisfied; or

(11) A partnership, association, or other unincorporated body of individuals, having its principal place of business within any country other than Germany, Austria, Hungary, or Austria-Hungary, or a corporation, organized or incorporated within any country other than Germany, Austria, Hungary, or Austria-Hungary, and that the control of, or more than 50 per centum of the interests of voting power in, any such partnership, association, other unincorporated body of individuals, or corporation, was at such time, and is at the time of the return of any money or other property, vested in citizens or subjects of nations, States, or free cities other than Germany, Austria, Hungary or Austria-Hungary: *Provided, however,* That this subsection shall not affect any rights which any citizen or subject may have under paragraph (1) of this subsection;—

Then the President, without any application being made therefor, may order the payment, conveyance, transfer, assignment, or delivery

corporation incorporated within any country other than the United States, and was entirely owned at such time by subjects or citizens of nations, States, or free cities other than Germany or Austria or Hungary or Austria-Hungary and is so owned at the time of the return of its money or other property hereunder."

Also, that the purpose to exclude corporations from Paragraph (1) is further accentuated by the legislative construction disclosed by Paragraph (11), adopted March 4, 1923, c. 285, 42 Stat. 1511, 1513—

"(11) A partnership, association, or other unincorporated body of individuals, having its principal place of

---

of such money or other property held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest, therein to which the President shall determine such person entitled, either to the said owner or to the person by whom said property was conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian:

*Provided,* That no person shall be deemed or held to be a citizen or subject of Germany or Austria or Hungary or Austria-Hungary for the purposes of this section, even though he was such citizen or subject at the time first specified in this subsection, if he has become or shall become, ipso facto or through exercise of option, a citizen or subject of any nation or State or free city other than Germany, Austria, or Hungary, (first) under the terms of such treaties of peace as have been or may be concluded subsequent to November 11, 1918, between Germany or Austria or Hungary (of the one part) and the United States and/or three or more of the following-named powers: The British Empire, France, Italy, and Japan (of the other part), or (second) under the terms of such treaties as have been or may be concluded in pursuance of the treaties of peace aforesaid between any nation, State, or free city (of the one part) whose territories, in whole or in part, on August 4, 1914, formed a portion of the territory of Germany or Austria-Hungary and the United States and/or three or more of the following-named powers: The British Empire, France, Italy, and Japan (of the other part). For the purposes of this section any citizen or subject of a State or free city which at the time of the proposed return of money or other property of such citizen or subject hereunder forms a part of the territory of any one of the following nations: Germany, Austria, or Hungary, shall be deemed

business within any country other than Germany, Austria, Hungary, or Austria-Hungary, or a corporation, organized or incorporated within any country other than Germany, Austria, Hungary, or Austria-Hungary, and that the control of, or more than 50 per centum of the interests or voting power in, any such partnership, association, other unincorporated body of individuals, or corporation, was at such time, and is at the time of the return of any money or other property, vested in citizens or subjects of nations, States, or free cities other than Germany, Austria, Hungary or Austria-Hungary: *Provided, however,* That this subsection shall not affect any rights which any citizen or subject may have under Paragraph (1) of this subsection."

---

to be a citizen or subject of such nation. And the receipt of the said owner or of the person by whom said property was conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian shall be a full acquittance and discharge of the Alien Property Custodian or the Treasurer of the United States, as the case may be, and of the United States in respect to all claims of all persons heretofore or hereafter claiming any right, title, or interest in said property, or compensation or damages arising from the capture of such property by the President or the Alien Property Custodian: *Provided further, however,* That except as herein provided no such action by the President shall bar any person from the prosecution of any suit at law or in equity to establish any right, title, or interest which he may have therein.

(c) Any person whose property the President is authorized to return under the provisions of subsection (b) hereof may file notice of claim for the return of such property, as provided in subsection (a) hereof, and thereafter may make application to the President for allowance of such claim and/or may institute suit in equity to recover such property, as provided in said subsection, and with like effect. The President or the court, as the case may be, may make the same determinations with respect to citizenship and other relevant facts that the President is authorized to make under the provisions of subsection (b) hereof.

(d) Whenever a person, deceased, would have been entitled, if living, to the return of his money or other property hereunder, then

The proviso, of Paragraph (11) sufficiently repels the suggestion that it restricts Paragraph (1)—"This subsection [paragraph] shall not affect any rights which any citizen or subject may have under Paragraph (1) of this subsection."

Reporting, June 21, 1917, (H. Rep. 85, 65th Cong., 1st Sess.), the House Committee on Interstate and Foreign Commerce recommended passage of the original Trading with the Enemy Act, and said—

" The chief objects of this bill are (1) to recognize and apply concretely, subject to definite modifications, the principle and practice of international law interdicting trade in time of war, and (2) to conserve and utilize upon

---

his legal representative may proceed for the return of such property as provided in subsection (a) hereof: *Provided, however,* That the President or the court, as the case may be, before granting such relief shall impose such conditions by way of security or otherwise, as the President or the court, respectively, shall deem sufficient to insure that such legal representative will redeliver to the Alien Property Custodian such portion of the money or other property so received by him as shall be distributable to any person not eligible as a claimant under subsections (a) or (c) hereof.

(e) No money or other property shall be returned nor any debt allowed under this section to any person who is a citizen or subject of any nation which was associated with the United States in the prosecution of the war, unless such nation in like case extends reciprocal rights to citizens of the United States; nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917, and as to claimants other than citizens of the United States unless it arose with reference to the money or other property held by the Alien Property Custodian or Treasurer of the United States hereunder.

(f) Except as herein provided, the money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court.

(g) This section shall not apply, however, to money paid to the Alien Property Custodian under section 10 hereof.

a basis of practical justice enemy property found within the jurisdiction of the United States. . . . Citizens cannot be permitted directly or indirectly to augment the material resources of the enemy by commercial intercourse, and the necessity for this interdiction is more obvious today than at any period of the world's history. Never were the industrial, commercial and financial resources of belligerent nations so vital to the success of war as now. It is not extravagant to affirm that the effective organization of these resources is more likely to determine the result of the present conflict than armies and navies. Therefore, everything reasonably possible should be done to prevent our enemy from reaping the advantages of commercial transactions with the people of the United States. To summarize, the purpose of the bill is not to create new international rules or practices, but to define and mitigate them."

In a favorable report on the same measure, August 31, 1917, (S. Rep. 113, 65th Cong., 1st Sess), the Senate Committee on Commerce said—

" The purpose of this bill is to mitigate the rules of law which prohibit all intercourse between the citizens of warring nations, and to permit, under careful safeguards and restrictions, certain kinds of business to be carried on. It also provides for the care and administration of the property and property rights of enemies and their allies in this country pending the war. The spirit of the Act is to permit such business intercourse as may be beneficial to citizens of this country, under rules and regulations of the President, which will prevent our enemies and their allies from receiving any benefits therefrom until after the war closes, leaving to the courts and to future action of Congress the adjustment of rights and claims arising from such transactions. Under the old rule warring nations did not respect the property rights of their enemies, but a more enlightened opinion prevails

at the present time, and it is now thought to be entirely proper to use the property of enemies without confiscating it; also to allow such business as fire insurance, issuance and use of patents, etc., to be carried on with our enemies and their allies, provided that none of the profits arising therefrom shall be sent out of this country until the war ends."

The intent to conserve and utilize enemy property upon a basis of practical justice and to prevent the owners from receiving benefits therefrom until after the war, but without ultimate confiscation, is clear. And, where the words permit, the statute and its amendments should be liberally interpreted to that end.

By executive orders the President vested certain wide powers, conferred upon him by the Trading with the Enemy Act, in the Alien Property Custodian; and that officer diligently proceeded to sequestrate property which, as he held, belonged to enemies. See *Central Trust Co.* v. *Garvan*, 254 U. S. 554, 567; *Stoehr* v. *Wallace*, 255 U. S. 239, 245; *Commercial Trust Co.* v. *Miller*, 262 U. S. 51, 56. Reporting to the President, February 22, 1919, (Senate Doc., vol. 8, pp. 9, 13) the Custodian said—

"At the close of business on February 15, 1919, 35,400 reports of enemy property had been received. The property of each enemy person is treated in the office as a trust and administered by an organization which is built upon the general lines of a trust company. The number of separate trusts now being administered amounts to 32,296 [at one time, it is said, they amounted to 50,000— Senate Hearing, S. 3852, July 27, 1922, p. 21], and have an aggregate value of $502,945,724.75. About 9,000 of these cases are covered by reports in which the administration has not yet reached the stage of valuation. When the entire number of trusts reported shall have been finally opened on the books and the readjustment of values consequent upon appraisal shall have been com-

pleted, it is safe to say that the total value of the enemy property in the hands of the Alien Property Custodian will reach $700,000,000. . . .

" The legislative intent was plainly that all enemy property, concealed as well as disclosed, should be placed entirely beyond the control or influence of its former owners, where it cannot eventually yield aid or comfort to the enemy directly or indirectly. Until the peace terms are finally signed and the ultimate disposition of enemy property determined by the act of Congress, it shall be the firm purpose of the Alien Property Custodian to carry out the will of the Congress in respect thereto. Neither litigation nor threat of litigation ought to be interposed to stay that purpose."

During hostilities and thereafter he sequestered the property of enemy subjects, of citizens of the United States, of associated nations and of neutrals, found in the Philippine Islands, the Hawaiian Islands, the Virgin Islands, Porto Rico, and throughout continental United States. It included practically all forms of tangible and intangible assets—industrial plants, chemical and woolen mills, steamship lines, banks, land and cattle companies, salmon factories, mines of gold, silver and other metals, corporate bonds and shares of stock, real estate, trusts represented by securities, liquid assets, thousands of patents (5700), trade-marks, prints, labels and copyrights, etc., etc. The individual items varied in value from one dollar to thousands, even millions of dollars. The enactment was novel, and gave rise to many troublesome questions of fact and law.

After the conclusion of hostilities insistent demands were made for return of the property belonging to citizens of the United States, of associated powers, of neutrals, and of the states partly composed of territory detached from Germany or Austria.

The Act of July 11, 1919, c. 6, 41 Stat. 35, added to Section 9 a proviso which gave right of recovery to sub-

jects of associated nations whose property had been sequestrated solely because of residence within territory occupied by enemy forces, e. g., Belgium and Northern France. There were several hundred cases of French and Belgian property taken solely because the owners were in such occupied territory. [H. Comm. Hearings 1920, vol. 232–1, part 8, p. 11.] This amendment (copied in the margin *) applied to " a *person* who was an enemy or ally of enemy " and " is a *citizen or subject* of such associated nation." The words " citizen or subject " include " person," and " person," according to the statutory defi-

---

* *Provided, however,* That in respect of all property heretofore determined by the President to have been held for, by, on account of, or on behalf of, or for the benefit of a person who was an enemy or ally of enemy, if the President, after further investigation, shall determine that such person was an enemy or ally of enemy solely by reason of residence in that portion of the territory of any nation associated with the United States in the prosecution of the war which was occupied by the military or naval forces of Germany or Austria-Hungary, or their allies, and that such person is a citizen or subject of such associated nation, then the President, without any application being made therefor, may order the payment, conveyance, transfer, assignment, or delivery of such money or other property held by the Alien Property Custodian, or by the Treasurer of the United States, or of the interest therein to which the President shall determine such person entitled, either to the said enemy or to the person by whom said property was conveyed, transferred, assigned, delivered or paid over to the Alien Property Custodian. And the receipt of the said enemy or of the person by whom said property was conveyed, transferred, assigned, or delivered to the Alien Property Custodian, shall be a full acquittance and discharge of the Alien Property Custodian or the Treasurer of the United States as the case may be, and of the United States in respect of all claims of all persons heretofore or hereafter claiming any right, title, or interest in said property, or compensation or damages arising from the capture of such property by the President or the Alien Property Custodian: *Provided further, however,* That except as herein provided no such action by the President shall bar any person from the prosecution of any suit at law or in equity to establish any right, title, or interest which he may have therein.

nition, includes " corporation." The same meaning of " citizen or subject " should be accepted wherever they occur in the section.

March 31, 1920, the Attorney General advised the House Committee on Interstate and Foreign Commerce (H. Rep. 1089, 66th Cong., 2nd Sess.)—

" The Secretary of State has written to me that this Government has recognized that the provinces of Alsace and Lorraine have now become a part of France and that, in his opinion, the continued retention by the Alien Property Custodian of property of residents of these provinces who have acquired French nationality under the Versailles treaty of peace cannot fail to have an unfavorable effect upon the relations of the United States and France. The Secretary of State expressed the view that the Trading with the Enemy Act should be so amended as to allow the return of this property. He suggested that I recommend to Congress an amendment to this effect.

" The Secretary of State also points out that this Government has recognized the Republics of Poland and Czechoslovakia and the Kingdom of the Serbs, Croats and Slovenes, and that for this Government to retain the property of persons who are citizens of those countries and resident within their borders would have a prejudicial effect upon the relations between the countries in question and the United States. The Secretary of State's recommendation was that any amendment to the Trading with the Enemy Act should be broad enough to authorize the return of property belonging to citizens of these countries. He also felt that the amendment should cover the cases of residents of territory which may be allotted, under treaties yet to become effective, to an allied or associated power (as, for example, Trieste), as well as territory which, under plebiscites to be held in accordance with treaty provisions, may be allotted to a neutral country (as, for example, that portion of Schleswig which may be allotted to Denmark).

. "I am herewith forwarding to you a draft of a bill to amend Section 9 of the Trading with the Enemy Act, which I believe will provide the relief requested by the Secretary of State."

May 5, 1920 (H. Rep. 1089, 66th Cong., 2nd Sess.), the Secretary of State wrote to the Attorney General—

"I have the honor to refer to my letter of March 23, 1920, concerning an amendment to Section 9 of the Trading with the Enemy Act, authorizing the release of property taken over by the Alien Property Custodian belonging to enemy persons who, by virtue of the peace treaties, become citizens, subjects or nationals of countries other than Germany, Austria or Hungary. In addition to the classes of property referred to therein, I believe that any amendment to Section 9 should also contain provisions permitting the return of all property which, at the time it was taken over by the Alien Property Custodian, belonged to nationals, citizens or subjects of the United States, as well as those of neutral or friendly states and of Turkey and Bulgaria.

"The various neutral and allied states whose nationals' property has been taken over by the Alien Property Custodian by reason of their residence in enemy or ally of enemy territory, or otherwise, for some time have been pressing for the release of such property. It appears that the Department of Justice has ruled that, under the Trading with the Enemy Act in its present form, it is not in a position to release this property. During the actual conduct of hostilities, it may have been advisable to retain such property. In view, however, of the cessation of hostilities, this Department feels that the government should no longer retain this property, even though a technical state of war may still exist. To do so would undoubtedly create an unfavorable impression in the states concerned, and would be of no advantage to the United States in its negotiations with enemy countries."

Enclosing the letter last quoted, the Attorney General wrote again to the House Committee, May 11, 1920 (H. Rep. 1089, 66th Cong., 2nd Sess.)—

"Referring to my letter of March 31, concerning certain legislation amendatory to Section 9 of the Trading with the Enemy Act to be submitted to your committee at the suggestion of the Secretary of State, as stated to you in my letter of April 22, through inadvertence the draft of the proposed legislation was not enclosed in the letter of March 31, and thereafter the Secretary of State requested that the matter be held up so that certain additional relief, which he considered necessary to give, might be incorporated in the proposed amendment. These suggestions he has since furnished to me, and the inclosed draft of a bill, amending Section 9, has been drawn with a view to meeting these suggestions. I am also enclosing a copy of his letter to me, dated May 5, 1920, in order that your committee may have the benefit of the information which it contains.

"The relief called for by this letter required extensive changes in the text of the bill which was designed to accompany my letter of March 31, and accordingly I will reanalyze its provisions, and indicate the change which it would make in existing law. . . .

"Subsection (b) of the proposed amendment provides, in substance, for the return of all enemy property, except that held by persons who are in fact bona fide subjects or citizens of Germany, Austria or Hungary."

May 21, 1920, the Secretary of State sent the following to the same Committee (H. Rep. 1089, 66th Cong., 2nd Sess.)—

"The Attorney General has informed me that on May 11, 1920, he submitted to you a draft of an amendment to Section 9 of the Trading with the Enemy Act, permitting the return of property taken over by the Alien Property Custodian belonging to citizens or subjects of neutral

states and states associated with this government in the World War, as well as to persons who have or will, in pursuance of treaty provisions, become citizens or subjects of such states, for example Alsace-Lorraine, or citizens or subjects of new states which have been recognized by this government, such as Poland and Czechoslovakia.

" The draft, it is understood, is largely based on representations from this Department, made in view of the fact that the Attorney General holds that under the Trading with the Enemy Act, in its present form, he is unable to release property to owners, who when it was taken over were included, for any reason, in the terms ' enemy ' or ' ally of enemy,' as used in the Act, and consequently, in spite of strong representations by various neutral and associated governments, it has been impossible to return the property of their nationals, which it would appear this government should no longer retain. To longer retain property of this character can hardly fail to unfavorably affect the relations of this government with the governments concerned, and I am strongly of the opinion that Section 9 of the Act should be amended at an early date, so as to permit in proper cases the return of such property. I hope that it will be possible to give favorable consideration to the matter, and that an amendment of the Act can be passed before the recess of Congress."

The House Committee held protracted hearings (H. Comm. Hearings 1920, vol. 232-1, part 8); and heard representatives of the State Department, the Attorney General's Office and the Alien Property Custodian, who stated what had been done and pointed out the purpose of the proposed amendments. The following is quoted from statements of Mr. Hill, Assistant to the Solicitor, State Department, and Mr. Boggs, Special Assistant to the Attorney General.

" The Chairman. [Mr. Hill,] does the seizure and retention of this property, by the Alien Property Custodian, of citizens of Czechoslovakia, Jugo-Slavia, Bulgaria, Turkey and Alsace-Lorraine, involve any embarrassment on the part of the State Department?

" Mr. Hill. It does; yes, sir. In addition to that, they have taken the property of citizens of Switzerland, Holland and other neutral countries, who at the time by reason of residence in Germany or otherwise, were included in the term 'enemy.' We have taken over that property, and under the present wording of the Act the Custodian cannot release it, and the Attorney General cannot upon application act favorably, because it was, technically, enemy property at the time. We have a number of cases of that kind and they are causing a great deal of embarrassment.

" I may also refer to the case of Czechoslovakia. This government has recognized the government of Czechoslovakia. Congress made an appropriation for a minister to that country and we have accredited a minister there. This government has recognized the existence of that country through the Executive, and yet we continue to hold the property of its citizens, which we cannot release at this time without an amendment of the Act, because they were enemies at the time the property was taken over. The Czechoslovakian government has pressed us a good deal for the return of that property. Conditions in Czechoslovakia, Poland, Jugo-Slavia, etc., are very serious and the return of their citizens' property, in view of the very advantageous rates of exchange at this time, would be of material assistance in the rehabilitation of those countries.

" Take the case of Poland; the same situation exists there. We have a great deal of Polish property. Where the Poles were residing in that part of Poland which was formerly Austria-Hungarian or German territory, the de-

partment has been very much embarrassed because there is no discretion with the Attorney General to return such property. There has been considerable irritation shown by the various neutral countries and considerable pressure by these new associated states, such as Poland and Czecho-slovakia and also Jugo-Slavia, which is a part of the Kingdom of the Serbs, Croats and Slovenes. We continue to hold the property of their citizens, although they were our associates during the war.

" Mr. Denison (of the committee). Under the terms of this bill can that situation be met in the case you referred to of citizens of Sweden and Norway?

" Mr. Hill. Paragraph 1 on page 4 permits the return of property of ' a citizen or subject of any nation or state or free city other than Germany or Austria or Hungary or Austria-Hungary (including any state or free city in the four nations last named).' That would permit the return of such property."

" Mr. Dewalt (of the committee). [Mr. Boggs,] does the proposed Act have in contemplation the cases of residents of Alsace-Lorraine, occupied territory?

" Mr. Boggs. Yes, sir.

" Mr. Dewalt. How do you protect them and what rights do they receive under this act?

" Mr. Boggs. That refers to subdivision No. 1 of subsection *b*, contained on page 4 of the present draft. 'A citizen or subject of any nation or State or free city other than Germany or Austria or Hungary or Austria-Hungary '—as it now reads—'(including any State or free city in the four nations last named), and is at the time of the return of his money or other property hereunder a citizen or subject of any such nation or State or free city.'

Now, that would permit the return to a person who was not a citizen at the time the property was taken and is not now a citizen of one of the enemy countries. In order to clarify the situation with regard to Alsace-Lor-

raine and other countries that have been transferred from enemy to nonenemy or friendly status, by virtue of the war, there has been inserted the proviso " [to Section 9 quoted above].

The foregoing letters and statements indicate the complicated situation which followed common acceptance of the Treaty of Versailles and failure by the United States to end the technical state of war until July 2, 1921 (c. 40, 42 Stat. 105). They reveal the desire of the Executive Departments for prompt return of sequestered property not owned by bona fide subjects or citizens of Germany or Austria-Hungary, and their interpretation of the proposed enactment. Paragraphs (1), (4), (6), (7) and (8) of subsection (b) apparently originated with the State Department. The House Committee made a favorable report upon the bill, accompanied by these letters (H. Rep. 1089, June 2, 1920, 66th Cong., 2nd Sess.), and among other things said—

" The bill has the approval of the Departments of Justice and State, as will appear by the letters attached and which are made a part of this report.  .  .  .

" The United States, while holding approximately $556,000,000 worth of private property which it found in this country belonging to individual citizens of enemy countries residing in their country at the outbreak of the war and still residing there, does not intend to confiscate this property. It was the intention of Congress when the property was taken that it should merely be held in custody during the war and that after the war the property or its proceeds should be returned to the owners. It has never been the purpose or the practice of the United States to seize the private property of a belligerent to pay our government's claims against such belligerent. Such practice is contrary to the spirit of international law throughout the world. The reasons for the enactment of the pending measure are clearly set forth in the accompany-

ing communications received from the Attorney General and the Secretary of State. For the reasons set forth in the letter of the Secretary of State prompt and favorable action is urged in order that the State Department may be relieved of some embarrassment in its dealings with some countries of Europe. For these reasons the committee favorably reports the bill as above amended."

The House (Cong. Rec. vol. 59, part 8, p. 8429) passed the bill shortly after this report, and within a few days thereafter the Senate took like action (*id.* 8475). The manifest design was to restore certain property in compliance with the original purpose of Congress.

The amending statute re-enacted the material provisions of original Section 9 as Subsection (a), and added six subsections—(b), (c), (d), (e), (f) and (g). It deleted the proviso of July 11, 1919, concerning persons in occupied territory, and inserted a general proviso applicable to the whole section, which directs that no *person* shall be deemed or held to be *citizens or subjects* of Germany or Austria-Hungary who had been or should become citizen or subject of any state or nation partly composed of territory once held by either of those empires.* " Person," of course, includes corporation, and thus, in the section now to be construed, " citizen or subject " clearly include corporations and have their true and normal meaning.

---

* No person shall be deemed or held to be a citizen or subject of Germany, or Austria or Hungary or Austria-Hungary for the purposes of this section, even though he was such citizen or subject at the time first specified in this subsection, if he has become or shall become, ipso facto or through exercise of option, a citizen or subject of any nation or State or free city other than Germany, Austria, or Hungary, (first) under the terms of such treaties of peace as have been or may be concluded subsequent to November 11, 1918, between Germany or Austria or Hungary (of the one part) and the United States and/or three or more of the following-named powers: The British Empire, France, Italy, and Japan (of the other part), or (second) under the terms of such treaties as have been or may be

*Behn, Meyer & Company* v. *Miller* 266 U. S. 457, considers Section 9, and declares—

"Subsection (a) of Section 9 gives now, as the same words gave from the first, the right of recovery to any person never 'an enemy or ally of enemy,' within the statutory definitions. . . . Subsection (b) adds to those allowed to recover from the first a considerable number always within the definition of 'enemy' and affords to them the measure of relief which Congress deemed proper long after peace had been actually restored. . . . Before its passage the original Trading with the Enemy Act was considered in the light of difficulties certain to follow disregard of corporate identity and efforts to fix the status of corporations as enemy or not according to the nationality of stockholders. . . .

"Section 7, Subsection (c), was never intended, we think, to empower the President to seize corporate property merely because of enemy stockholders' interests therein. Corporations are brought within the carefully framed definitions (Sec. 2) of 'enemy' and 'ally of enemy' by the words 'Any corporation incorporated within such territory of any nation with which the United States is at war [or any nation which is an ally of such nation] or incorporated within any country other than the United States and doing business within such territory.'"

We there pointed out that under the Act a corporation is an entity with character of its own irrespective of the status attributed to stockholders, and is "enemy" only when directly within the statutory definition. The theory that all corporations are excluded from Subsection (a)

concluded in pursuance of the treaties of peace aforesaid between any nation, State, or free city (of the one part) whose territories, in whole or in part, on August 4, 1914, formed a portion of the territory of Germany or Austria-Hungary and the United States and/or three or more of the following-named powers: The British Empire, France, Italy, and Japan (of the other part).

because some are specifically mentioned in Subsection (b), Paragraph (6), was definitely rejected; and we held that a corporation of the Straits Settlements (British in character) which had never done business in enemy territory did not come within the definition, although German nationals owned the controlling interest.

In his letter of May eleventh the Attorney General expressed the view that Subsection (b) provided " for the return of all enemy property, except that held by persons who are in fact bona fide subjects or citizens of Germany, Austria or Hungary;" and the Secretary of State thought that it permits the ".return of property taken over by the Alien Property Custodian belonging to citizens or subjects of neutral states, and states associated with this government in the World War, as well as to persons who have or will, in pursuance of treaty provisions, become citizens or subjects of such states, for example, Alsace-Lorraine, or citizens or subjects of new states which have been recognized by this government, such as Poland and Czechoslovakia."

The eight paragraphs of Subsection (b) are separated by " or," and owners of seized property who are within any described class may recover. Every paragraph adds some owners, and none restricts another by express words. The apparent purpose was to relieve any owner *if* within *any* paragraph—not to mark out inclusive and exclusive classes.

Paragraph (1) is broad enough to include the property of all neutrals, and so to interpret it will do no violence to any part of the Act. The words " citizen or subject," as commonly used in international matters, include corporations. *Paul* v. *Virginia,* 8 Wall. 168, 177, 178; *United States* v. *Northwestern Express Co.,* 164 U. S. 686, 689; *Ramsey* v. *Tacoma Land Co.,* 196 U. S. 360, 362; *Moore's International Law Digest,* vol. III, p. 804; vol. VI, pp. 641, 642.

Corporations of neutral countries, although controlled by enemy stockholders, were never declared to be, "enemy" unless they did business within hostile territory; the statute gave no regard to residence or nationality of stockholders. Such business also made enemies of neutral individuals; and they can recover under Paragraph (1). Hostilities having ended, neutral nations could properly demand the same right for their corporations. Confiscation is everywhere disavowed; neutral property may not be used for adjusting claims against belligerents; and ordinary fair dealing requires its release. To seize the effects of a neutral corporation after cessation of hostilities and then hold them solely because of some enemy stockholder, would defeat the lawmakers' honorable intention and give rise to grave suspicion concerning the purpose of our government. On the argument counsel for appellees admitted that the view which he advocated would prevent return of the sequestered property of a corporation organized under the laws of a neutral nation if a German subject owned a single share of the stock—if, indeed, he owned less than one per cent., while Americans or neutrals held the remainder. This unfortunate, if not absurd, result indicates the unsoundness of the proposed construction.

Paragraphs (2) and (3) add certain women who married enemy nationals; (4) and (5) add diplomatic and consular officers and interned persons; (7) and (8) make further definite additions.

Paragraph (6) adds to those already described, " a partnership, association, or other unincorporated body of individuals outside the United States " (Germany and Austria-Hungary are outside); also " a corporation incorporated within any country other than the United States (this includes Germany and Austria-Hungary) and was entirely owned at such time by subjects or citizens of nations, States or free cities other than Germany or Austria or Hungary or Austria-Hungary and is so owned at

the time of the return of its money or other property hereunder." This includes corporations of Germany or Austria-Hungary, or of any state left within those empires,* if entirely owned by citizens of the United States or an associated power or a neutral. The practice of organizing local companies to do the business of foreign owners has become very general. Certain important German corporations were wholly owned by individuals or corporations of the United States. British subjects had large investments in German concerns; and probably the same is true of subjects of Sweden, Norway, Holland, Denmark, Switzerland and Italy. There were obvious reasons for releasing property of a corporation when wholly owned by our own people, by nationals of associated powers, or by neutrals; and Paragraph (6) effects this.

Consider—

That the purpose of the original Act was to provide for the care and administration, pending the war, of property which might be helpful to our enemies, and to deprive the owners of its use " until the war closes."

That no corporation was declared " enemy " because of the nationality of stockholders, but only when incorporated within enemy territory or doing business there.

That property of Americans, of citizens of associated nations and of neutrals was sequestered because of residence or business carried on within enemy countries.

That although appellant had been permitted to do business within the United States during the whole period of

---

* German Civil Code (1900)—

Sec. 22. An association whose object is the carrying on of an economic enterprise acquires juristic personality, in the absence of special provisions of Imperial law, by grant from the State. The power to make such grant belongs to the State in whose territory the association has its seat.

Sec. 23. An association whose seat is not in any State may, in the absence of special provisions of Imperial law, be granted juristic personality by resolution of the Federal Council.

actual hostilities its property was seized after the armistice when such property could not be utilized for hostile purposes.

That the Act of 1919 permitted return of property of any " person " (this includes corporation) then a " citizen or subject " of an associated power treated as "enemy" solely because of residence within enemy lines.

That after the armistice our Executive Departments represented to Congress the urgent demands for sequestered property of citizens and subjects of associated nations, neutrals, and states composed in part of territory formerly within Germany or Austria-Hungary, and reported the impending deleterious effect upon our foreign relations.

That the agents of the State Department and the Attorney General's office pointed out that the amendments proposed by them provided, " in substance, for the return of all enemy property except that held by *persons* who are in fact bona fide subjects or citizens of Germany, Austria or Hungary."

That a general proviso applicable to *all* of Section 9 directs that, for its purposes, " no *person* shall be deemed or held to be a citizen or subject of Germany or Austria or Hungary or Austria-Hungary," if he becomes the subject of any nation composed in part of territory formerly belonging to those empires, and it extends relief to such persons. The words " citizen or subject," as there used, clearly include " persons," and, by statutory definition, the latter includes a corporation.

That the original seizure of the property in question would be difficult to justify; and certainly the United States can have no moral right longer to retain or to confiscate it. Neutral property cannot be used in settlement of claims against enemy countries. So to do would be wholly inconsistent with our traditions and pretensions.

That the words "citizen or subject of any nation," in Paragraph (1), according to common usage, are broad enough to include corporations.

That the use of the disjunctive " or," in separating the paragraphs of Subsection (b), indicates that if an owner comes within the description of any class he may recover. The fact that he falls within more than one is not material.

That Paragraph (6) describes a class of owners not within the words of Paragraph (1) and affords possible relief, obviously desirable, for our own citizens, associates and neutrals.

That a liberal construction should be given the amendment with a view to carrying out its benevolent purposes, and not a narrow, strained one which would reflect discredit upon the Government.

That the construction asked by appellees is neither natural nor necessary and would lead to the unfortunate conclusion that seized property of a neutral corporation must be retained because a German owns one share out of many thousand. Without doing violence to any part of the Act and by giving effect to every word therein, citizens of neutrals may secure just relief and the United States escape the serious charge of oppressive and unfriendly action.

In view of all these things, I am unable to accept the view which appellees urge upon us. It seems sufficiently plain that the court below fell into error; and to affirm the challenged decree would leave our Government in a most unenviable position. "There is no debt with so much prejudice put off as that of justice."