**SWISS NAT. INS. CO. Ltd., v. CROWLEY,**
Alien Property Custodian, et al.

No. 8398.

United States Court of Appeals for the
District of Columbia.
Argued April 14, 1943.
Decided May 24, 1943.

Mr. Frederic R. Coudert, of New York
City, with whom Mr. James J. Lenihan,
of Washington, D. C., was on the brief,
for appellant.

Mr. Harry LeRoy Jones, Special Assist-
ant to the Attorney General, with whom
Mr. Frederick L. Smith, Attorney, Depart-
ment of Justice, of Washington, D. C.,
was on the brief, for appellees.

Before GRONER, Chief Justice, and
MILLER and VINSON, Associate Justices.

GRONER, C. J.

Apellant is a corporation organized under
the laws of Switzerland. In 1910 it es-
tablished a branch office in New York for
the transaction of its insurance business in
that State and elsewhere in the United

States. Both before and during the World War it maintained branches in Germany and transacted business in that country. Its capital stock was largely owned by German nationals[1]. Consequently, it admittedly fell within the definition of "enemy" by the terms of Section 2 of the Trading with the Enemy Act,[2] and its property became subject to seizure by the United States after the passage of the Act. However, upon our entry into the War, the President issued a proclamation permitting insurance Companies "incorporated under the laws of the German Empire" to continue to operate, provided that no funds of such companies be transmitted outside the United States nor used to establish a credit within or without the United States for the use or benefit of the enemy or his allies. Appellant, apparently availing itself of this permission,[3] continued business as usual until November 27, 1917. On that date the Secretary of the Treasury, pursuant to Section 5 of the Trading with the Enemy Act, granted appellant a license to continue in business in the United States, subject to the condition "that the funds of the company held or received in the United States by managers, trustees, or others, be subject to all the restrictions imposed by the Trading with the Enemy Act, except as herein provided."

Subsequently, on October 6, 1918, appellant was granted a second license which provided that it submit to the Alien Property Custodian as required a statement of all income, outgo, assets, and liabilities; that no securities or other invested assets be disposed of without the consent of the Alien Property Custodian; that any time on order of the Custodian it deliver to him all or any part of its securities and other assets or property in the United States; and that the license was revocable on notice. The power of revocation was exercised November 15, 1918, and the Alien Property Custodian took over all the assets of the company as of November 18, 1918.

Thereafter, on January 6, 1922, appellant brought suit in the Supreme Court of the District of Columbia (now the United States District Court) against the Alien Property Custodian and the Treasurer of the United States to recover all of the property and securities seized by the Custodian, on the grounds that since the seizure the company had ceased to do business in Germany, that the War had ended, and that by virtue of the amendment to the Trading with the Enemy Act, approved June 5, 1920,[4] appellant became expressly entitled to the recovery sought. The suit was dismissed by the trial court and its action affirmed by this court[5] and by the Supreme Court[6] on the grounds (1) that the cessation by the corporation of business in Germany did not change the status of its seized property as enemy property; (2) that the termination of the War between the United States and Germany, as a consequence of which the corporation ceased to be an enemy, did not entitle it to the return of its seized property, but its rights depended on later Congressional direction; and (3) that the language of the 1920 amendment, providing *inter alia* for the return of the seized property of "a citizen or subject of any nation or State or free city other than Germany or Austria or Hungary or Austria-Hungary," should not be construed to include appellant.

On March 3, 1924, while this case was pending in the Supreme Court, appellant filed a claim with the Alien Property Custodian for the return of profits earned while it operated under the President's Proclamation and the two licenses mentioned above. June 15, 1925, a little more than four months after the Supreme Court's decision, the President (without knowledge, *it is said, of the decision of the Supreme Court*), on the recommendation of the Attorney General, approved the claim, and a sum in excess of $400,000, representing such profits and interest thereon, was returned to appellant.

Thereafter, in March of 1930, under the terms of the Settlement of War Claims Act,[7] appellant applied for and was paid by the Alien Property Custodian approximately $650,000, being 80% of the principal

---

[1] Swiss Nat. Ins. Co. v. Miller, 267 U. S. 42, 45 S.Ct. 213, 69 L.Ed. 504.

[2] 40 Stat. 411, 50 U.S.C.A. Appendix.

[3] It is to be noted that the Proclamation, in terms, is restricted to German insurance companies, which would exclude appellant, a Swiss company.

[4] 41 Stat. 977, 50 U.S.C.A. Appendix, § 9.

[5] Swiss Nat. Ins. Co. v. Miller, 53 App. D.C. 173, 289 F. 571.

[6] Swiss Nat. Ins. Co. v. Miller, 267 U. S. 42, 45 S.Ct. 213, 69 L.Ed. 504.

[7] 45 Stat. 270, 50 U.S.C.A. Appendix, § 9.

of the remaining seized property then in his possession. September 2, 1931, appellant brought suit against the Custodian and Treasurer of the United States for an accounting as to certain reservations made in this settlement. The Custodian and Treasurer answered and filed a counterclaim to recover 20% of profits earned by appellant while operating under license, and returned to it in the manner detailed above, on the ground that the return of the whole of the profits was improper. The main suit was adjusted, trial was had on the counterclaim, and judgment on it entered for appellees.

■ On this appeal appellant argues that the lower court erred in sustaining the Government's claim because (1) the action of the President in recognizing appellant's claim and paying over the money is not now reviewable, but, if reviewable, his construction of the law should not be set aside in the absence of some cogent reason therefor and that no such reason has been shown, (2) the suit for restitution is equitable and will not lie in the circumstances of this case, even though the payment was illegal and could not have been had at law, and (3) while appellant was operating under the Government licenses to which we have referred it was not an enemy and its profits earned during that period were not enemy property subject to seizure.

The first mentioned ground is not new. In Cummings v. Societe Suisse, 66 App. D.C. 121, 123, 85 F.2d 287, 289, we said: "* * * it seems to us wholly unwarranted to claim * * * that the United States are bound by their former action or that the President's finding that the corporation was entitled to the return of the property so forecloses the controversy that it is not now the subject of judicial review. The government is never bound by the unlawful action of its officers; nor is it estopped by the acts of its agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit."

The same argument was urged and rejected in Isenberg v. Biddle, 75 U.S.App. D.C. 100, 103, 125 F.2d 741, 744, where, as here, a counterclaim was filed by the United States. We there said: "We have, therefore, no manner of doubt that a suit of this nature on behalf of the United States by the Attorney General and Treasurer is authorized by law and equally no manner of doubt but that it could be filed as a counterclaim, * * *."

■ Little need be said in disposing of the second ground. Appellant came into court to assert a claim against the United States. It thereby submitted itself to the jurisdiction of the court that complete justice might be done. If, therefore, it is shown that it obtained moneys of the United States to which it was not entitled under existing law, it certainly will not be inequitable to require it to account for them and pay them back. See Isenberg v. Biddle, supra.

This, then, brings us to appellant's third and main proposition. We think it is not convincing. In urging its consideration appellant says that the effect of the action of the Government in granting it licenses was to exempt it, as licensee, from all restrictions attaching to enemy status, and to restore it to the position it held before our entry into the War. This appellant says is the common law rule. Four cases are relied upon.[8] But assuming this to be the rule, neither it nor the cases cited is determinative of the question here, which requires an examination of the licenses and the statute under which they were issued to ascertain the conditions attached to the privilege accorded appellant, and the extent to which the Government retained control over its property.

■ The licenses granted were authorized by Section 4 of the Trading with the Enemy Act, which provided that every enemy or ally of enemy insurance or reinsurance company might be granted a license, temporary or otherwise, containing such provisions and conditions regulating the control and disposition of the funds of the company as the President should deem necessary. The licenses were subject to the restrictions imposed by the Act. Upon their withdrawal, and they were by terms revocable on notice,[9] Section 7(c) of the Act, providing for the seizure of the property of an enemy not holding a license,

[8] Usparicha v. Noble, 13 East 332; Fenton v. Pearson, 15 East 419; United States v. Homeyer, 26 Fed.Cas. page 278, No. 15,353; United States v. 100 Barrels of Cement, 27 Fed.Cas. page 292, No. 15,945.

[9] Section 4 also provides that any license may be revoked "in such manner and at such times as the President shall determine."

became operative and, upon such seizure, appellant was divested of every interest in the property,[10] whether profits or not, for there is no provision in the Act exempting profits from seizure, whether earned before or during the War. The acknowledged purpose of the legislation was to protect American policy holders who might have suffered from the immediate cessation of business by such companies. But in accomplishing this Congress did not change appellant's status as an enemy during the license period. At most there was a forbearance by the United States to exercise their rights, and when they chose to exercise them and cancelled the license, the property of appellant was in precisely the same position as any other enemy property found within the United States.

▆ As the Supreme Court said in Swiss Nat. Ins. Co. v. Miller [267 U.S. 42, 45 S.Ct. 214, 69 L.Ed. 504], to which we have referred, "The word 'enemy' used in Section 12, of course refers to the person who or corporation which fulfilled the definition of an enemy during the war;" appellant was at all times during the War an enemy within the meaning of existing law; and appellant's property was lawfully taken over by the Custodian. Since, as we think, no distinction may properly be made between appellant's capital property and its income earned during the period of its operation under the licenses, it follows that that decision is applicable here, and that appellant's only right to relief was "that provided by the terms of this Act,"[11] and except the amendment of 1920, which the Supreme Court held not to apply to appellant, the only provision for the return of enemy properties is in Section 12: "After the end of the war any claim * * * shall be settled as Congress shall direct."

▆ What we hold, therefore, is that appellant's profits earned during the War were in all respects as other property owned by it, and when taken by the Custodian became the property of the United States absolutely, to be disposed of after the War as Congress deemed expedient. Provisions for disposition were made by the War Claims Act of March 10, 1928, whereby restoration of 80% was authorized, with 20% withheld to meet the claims of our nationals against Germany. Appellant, however, received, with the approval of the President in 1926, 100%. It was for 20% of this, to which it was not entitled, that this counter suit was brought, and since, as we think, the payment of it by the President was without authority of law, the action of the lower court in ordering its return was correct and should be affirmed.

Affirmed.

[10] Cummings v. Deutsche Bank, 300 U. S. 115, 57 S.Ct. 359, 81 L.Ed. 545.

[11] Section 7(c) "The sole relief and remedy of any person having any claim to any money or other property * * * seized by him [Custodian] shall be that provided by the terms of this Act."