L. LITTLEJOHN & CO., INC., ET AL.` *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 94.  Argued January 7, 1926.—Decided March 1, 1926.

1. Damages are not recoverable from the United States under the Suits in Admiralty Act (March 9, 1920,) for a collision due to the fault of a vessel owned and in possession of the United States and being operated in transporting supplies and troops. P. 223.
2. In the absence of convention, every government may pursue what policy it thinks best concerning seizure and confiscation of enemy ships in its harbors when war occurs. P. 226.
3. The Joint Resolution of May 12, 1917, authorized the President to take over to the United States the immediate possession and title

of any vessel within the jurisdiction which, at the time of coming therein, was owned by any subject of, or was under register of, an enemy nation; and this was within the power of Congress. P. 227.

Affirmed.

APPEAL from a decree of the District Court in Admiralty, dismissing libels for damages due to collision.

*Messrs. James W. Ryan* and *John M. Woolsey,* with whom *Messrs. T. Catesby Jones, D. Roger Englar,* and *J. M. R. Lyeth* were on the brief, for appellants.

The relation of the United States to the seized ships was the same as the relation of the Alien Property Custodian under the Act of October 6, 1917, to the other enemy-owned private property afterwards seized by him. *Central Trust Co.* v. *Garvan,* 254 U. S. 554; *United States* v. *Chemical Foundation, Inc.,* 5 Fed. (2d) 191; *The Western Maid,* 257 U. S. 419, distinguished; "Camillus Letters" of Alexander Hamilton; Moore Dig. Int. Law, Vol. 7, p. 308.

The United States has failed to prove that the Antigone at the time of collision had a status which would prevent the ordinary maritime lien attaching. The doctrine of the offending thing which has been so thoroughly established in our law seems to have only one exception, so far as this Court has determined; namely, when the United States has a property interest in the vessel or has promised to keep her free from liens, and the vessel is engaged in a public service. *The Western Maid, The Liberty, The Carolinian,* 257 U. S. 419; *Ex Parte State of New York, No. 1,* 256 U. S. 490; *Ex Parte State of New York, No. 2,* 256 U. S. 503.

The United States confessedly not only did not have title to the vessel, but did not have any property interest in her and had not promised to keep her free from liens, because no prize court proceedings had been had to subject her to forfeiture, and the steps taken by the Presi-

dent, acting through the Shipping Board, at most only purported to go so far as to take possession of the vessel—if indeed they could have gone further without resort to judicial proceedings. It is clear that the vessel was not technically in the possession of the United States at the time of the collision, because, she had been placed out of commission in the Navy and, though transferred to the Army Transport Service, was in possession of master, officers, and crew who are not shown to have any commissions from the President and, therefore, to have been officers of the United States within the meaning of the Constitution. Furthermore, whether the vessel was actually in the physical possession of the United States or not, it is perfectly certain that the United States had not secured by any proper proceedings the right to any possession, and that, therefore, the Antigone was not rightfully in the possession of the United States. *The Appam,* 243 U. S. 124.

The proceeding taken by the United States in the Court below amounted to an independent proceeding. It was in effect an informal proceeding in prize by which the United States submitted itself to the jurisdiction of the Court to have the status of the Antigone and its rights with regard to her determined. *Ex parte Muir,* 254 U. S. 522; *United States* v. *The Thekla,* 266 U. S. 228.

The United States must take the consequences of its failure to follow orderly procedure and have the Antigone condemned by a prize court, as was done by England in the case of *The Marie Leonhardt,* 1921 Prob. 1, or requisitioned by an order of the prize court, as was done in the case of *The Edna,* 3 Brit. & Col. Prob., 407. What the President should have done in connection with the Antigone in taking her over for military use is shown in *The Pedro,* 175 U. S. 354. Cf. *The Rita,* 89 Fed. 763.

This suit if brought against the ship *in rem* immediately after the collision could not have been regarded as

a suit in which the United States, or any of its property, in effect was being sued. If the United States did not stand exactly in the position of the Alien Property Custodian, it did hold possession merely as a receiver for the German owner and, like any other receiver, was not personally liable for the negligence of navigating servants whom it had used due care to select.

This matter is justiciable and not political. This suit is brought against the United States not because of any relation it had to the Antigone at the time of the collision on October 9, 1919; but because a maritime lien for collision arose at that time on the Antigone, because this lien is a property right, and the United States has taken over title to the vessel under the treaty, subject to this property right of the appellants. At the time of the collision the United States, being merely a custodian or receiver to conserve the Antigone, was not personally liable for the collision damage. The collision, however, created a lien on the Antigone because her only ship's paper was a German merchant vessel register, and she is not shown to have been in the possession of an officer of the United States as defined by the Constitution. After the collision, the Peace Treaty with Germany ended the receivership (so to speak) and the United States took over the vessel assets, including the Antigone, under the grant and confirmation made by Germany in the Treaty. This suit was then brought against the United States under The Suits in Admiralty Act, as a substitute for a suit *in rem* against the Antigone. This form of action was necessary because the Act provides that a maritime lien on a vessel which has afterwards been acquired by the United States must be brought not against the vessel, but against the United States, according to the principles of libels *in rem*. The relation of the United States to the Antigone at the time of the collision was substantially that of a licensee. In April, 1917, it sequestrated her,

and in May, 1917, asserted the privilege of using her as licensee or trustee without confiscating or promising to pay for her use. In other words, the United States never "took" any property interest in the Antigone.

If construed as a confiscation, the Resolution of May 12, 1917, is unconstitutional because it violates international law. *Miller* v. *United States,* 11 Wall. 268; *Hamilton* v. *Kentucky Distilleries,* 251 U. S. 146; Harv. L. Rev., Vol. 34, p. 777; *Brown* v. *United States,* 8 Cr. 110; Foreign Relations, U. S. (1907), Vol. II, p. 1158; Articles 1 and 2, Sixth Hague Convention (1907); *MacLeod* v. *United States,* 229 U. S. 416. The constitutionality of the Resolution must be qualified, if not impeached, unless it be construed to imply ultimate restitution of these merchant ships, or equitable indemnification therefor, or reparation. *Murray* v. *Chicago Co.,* 92 Fed. 868. The powers of Congress in peace and in war, as well as the treaty authority, respond to the law of nations "as understood in this country." It is axiomatic that no single nation can change the law of nations adversely to its general moral (if not everywhere, constitutional) obligation. And it is peculiarly the view of the common law that the municipal laws of a country cannot change international law. *The Scotia,* 14 Wall. 170; *The Paquete Habana,* 175 U. S. 677; *Downes* v. *Bidwell,* 182 U. S. 244 and other *Insular Cases; Chisholm* v. *Georgia,* 2 Dall. 419; Cooley, Const. L. (3d ed.), p. 123; *Brown* v. *United States,* 8 Cr. 110; *United States* v. *Percheman,* 7 Pet. 51; Art. XXIV, Prussian Treaty of 1799; *Pollard* v. *Kibbe,* 14 Pet. 353; 5 Hamilton's Works, Lodge ed., 126, 218; *Society, etc.* v. *New Haven,* 8 Wheat. 464; *The Peggy,* 1 Cr. 103. The early treaties between the United States and Prussia, assuring in effect the restitution, as well as the security of private enemy-owned property upon the coming of peace, are therefore not only a recognition of a theretofore existing rule of international law, but are

themselves a part of the international law which should be enforced by this Court. It is significant that these early treaties were regarded by the political branches of the United States as being so well settled a part of international law that it was not deemed necessary even to mention them in framing the more recent Treaty of Peace and Executive Agreement with Germany. If, as the Government's claim in the present case alleges, the United States acquired by the seizure a lawful right of possession, why was it necessary for this Government afterwards to have the German Government render that possession more valid by formal treaty? Under the Treaty of Peace with Germany of August 25, 1921, the satisfaction of all private American claims against Germany and the confirming to the United States " of seizures " imposed or made by the United States during the war, are the salient or expressed conditions upon which turn the retention of German property in the possession or control of the United States.

The Antigone was at most in the *custodia legis* of the United States and could not in any real sense be said to be a vessel of the United States entitled to immunity from liability as an essential tool or part of the sovereign.

The President did not seize or take over the possession of the Antigone after the adoption of the Resolution of May 12, 1917.

The District Court had no jurisdiction on its admiralty side to entertain the claim of the United States. The court should therefore have granted the motion of the libellants to transfer the claim proceeding of the United States to the prize side and permit the collision libels to be proved as cross suits or intervening claims in that proceeding. *The Appam,* 243 Fed. 230; *The Peterhoff,* 19 Fed. Cas. No. 11025; *Sawyer* v. *Maine, etc., Ins. Co.,* 12 Mass. 291; *Bradstreet* v. *Neptune Ins. Co.,* 3 Sumn. 600. It is now the accepted rule, both in international

law and under our Constitution, that the condemnation, to be effective, must be by a judicial tribunal, and that no administrative substitute can take its place. *The Appam,* 243 U. S. 124; *The Siren,* 22 Fed. Cas. No. 12911; *Oakes* v. *United States,* 174 U. S. 778; *The Nassau,* 4 Wall. 634. This is not only a rule of international law, but a principle confirmed by the Constitution of the United States. *Jecker* v. *Montgomery,* 13 How. 498; *The Resolution,* 2 Dall. 1; *Young* v. *United States,* 97 U. S. 39. The necessity after seizure of a deposit of value or a judicial condemnation, as a condition to the taking over by the Executive of an enemy vessel for military purposes, is still more evident on consideration of the decisions of this Court holding that vessels such as the Neckar are entitled to most liberal treatment and that a noncombatant enemy has a right not only to a judicial hearing and to appear and claim the seized vessel and contest the seizor's claims, but also to prosecute an appeal to this Court if the lower court's ruling should be unfavorable. *The Pedro,* 175 U. S. 354; *The Guido,* 175 U. S. 383; *The Buena Ventura,* 175 U. S. 384; *The Panama,* 176 U. S. 535; *The Paquete Habana,* 175 U. S. 677. Indeed, the rule of law requiring a judicial proceeding as a condition to the transfer of possession to the sovereign, is so well settled that the Navy Department has recognized it by general orders. *The Santo Domingo,* 119 Fed. 388. The suggestion that the law of maritime or prize seizure is confined to seizures on the high seas is refuted not only by the British authorities but also by the following American cases: *The Joseph,* 8 Cr. 451; *The Caledonian,* 4 Wheat. 100; *Dewey* v. *United States,* 178 U. S. 510; *The Santo Domingo,* 119 Fed. 386; *United States* v. *Steever,* 113 U. S. 747.; *The Rita,* 89 Fed. 763.

The resolution is unconstitutional because it reduces the extent of the constitutional grant of admiralty juris-

diction to the judiciary and impairs the substantive international maritime law. *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149; *Gableman* v. *Peoria Ry. Co.,* 179 U. S. 335; *Walters* v. *Payne,* 292 Fed. 124.

By granting immunity in the present case, this Court would be extending the theory of immunity beyond any of its existing decisions. Harv. L. Rev., Vol. 34, p. 165; Cardozo, Growth of the Law, p. 117; Laski, Foundations of Sovereignty, pp. 109, 126; Pound, Spirit of the Common Law, pp. 83–84; Stimson, Popular Law Making, p. 10; Carter, Law, Its Origin, Growth and Function, pp. 6, 8, 13–14; Gray, Nature and Sources of Law, 1921 ed., pp. 74, 233, 288; Salmond, Jurisprudence, pp. 202–203; Lightwood, Nature of Positive Law, p. 417; Vinogradoff, Outlines of Historical Jurisprudence, p. 86; Bryce, Studies in History and Jurisprudence, p. 538; Brown, Austinian Theory of Law, p. 194.

The claim or suggestion of the United States Attorney should be dismissed because not proved and because not presented by a proper officer; or should be regarded as a submission to jurisdiction enabling the collision lien to be enforced as a cross or intervening claim.

*Solicitor General Mitchell,* with whom *Assistant Attorney General Letts* and *Mr. J. Frank Staley,* Special Assistant to the Attorney General, were on the brief, for appellee.

Under the Joint Resolution of May 12, 1917, and the Executive Orders issued thereunder, the United States acquired lawful possession of and title to the Antigone. *Brown* v. *United States,* 8 Cr. 110; *Miller* v. *United States,* 11 Wall. 268; *Ware* v. *Hylton,* 3 Dall. 199; *The Western Maid,* 257 U. S. 419.

*The Western Maid,* 257 U. S. 419, settles the point that, as the vessel was owned by or in the lawful possession of the United States. and employed in the public

service at the time of the collision, she was immune from liability.

Mr. Justice McReynolds delivered the opinion of the Court.

The court below sustained a challenge to its jurisdiction, and this direct appeal followed.

October 9, 1919, in New York Harbor the steamships "Antigone" and "Gaelic Prince" collided. Serious injury resulted to the latter and its cargo. February 19, 1921, relying upon the Suits in Admiralty Act of March 9, 1920 (c. 95, 41 Stat. 525), the owners seek to recover damages. The Act of March 3, 1925, c. 428, 43 Stat. 1112, is not applicable. They allege that the collision resulted from the fault of the "Antigone." Also that—

"At all the times mentioned herein prior to the 13th day of October, 1919, and particularly on the 9th day of October, 1919, the date of the collision hereinafter mentioned, the steamship 'Antigone' was owned by a private person or merchant who was solely entitled to the immediate and lawful possession, operation, and control of said vessel. At no time prior to said 13th day of October, 1919, was the said steamship 'Antigone' owned, either absolutely or *pro hac vice*, by the United States of America, nor by any corporation in which the United States of America or its representatives owned the entire outstanding capital stock, nor lawfully in the possession of the United States of America or of such corporation, nor lawfully operated by or for the United States of America or such corporation. On the 13th day of October, 1919, the respondent United States of America became, ever since has been, and now is in the lawful possession of the steamship 'Antigone,' but at no time has the United States of America held the legal title to or been the absolute owner of said steamship 'Antigone.' "

The United States appeared specially and suggested that when the collision occurred they owned, possessed and controlled the "Antigone" and therefore the court was without jurisdiction. This was denied and evidence was taken upon the consequent issue. Having considered the evidence, the court held that the United States owned the vessel and were navigating her, with a crew employed by the War Department, in transporting supplies and troops. The libels were accordingly dismissed for want of jurisdiction.

If the established facts show such ownership, possession and control, then, under the doctrine of *The Western Maid*, 257 U. S. 419, to which we adhere, the decree is clearly right.

The history of the matter is this. The "Antigone"—then the privately-owned German merchantman "Neckar"— took refuge within the United States prior to April 6, 1917, when war with Germany was declared. By Joint Resolution of May 12, 1917, c. 13, 40 Stat. 75 (copied in the margin*), Congress authorized the President to take over to the United States the immediate possession and title of any vessel within their jurisdiction which at the time of coming therein was owned by any corporation, citizen or subject of an enemy nation, or was under register of any such nation. By Executive Order of June 30, 1917, the President affirmed that the "Neckar" was

---

*Resolved by the Senate and House of Representatives of the United States of America in Congress Assembled,* That the President be, and he is hereby, authorized to take over to the United States the immediate possession and title of any vessel within the jurisdiction thereof, including the Canal Zone and all territories and insular possessions of the United States except the American Virgin Islands, which at the time of coming into such jurisdiction was owned in whole or in part by any corporation, citizen, or subject of any nation with which the United States may be at war when such vessel shall be taken, or was flying the flag of or was under register of any such nation or any political subdivision or municipality thereof; and, through the United States Shipping Board, or any department or

such a vessel and ordered that " the possession and title " be taken over through the United States Shipping Board. He further authorized that Board to repair, equip, man and operate her. It accordingly took her, July 17, 1917, and thereafter a naval board appraised her. Subsequently she was transferred to the Navy Department, re-named the " Antigone," and later transferred to the Army Transport Service. October 9, 1919, she sailed under a master, officers and crew of the United States Transport Service from New York bound for Brest, from which port she was to return with troops.

Appellants say that the rules of international law as recognized by the United States forbade them from confiscating German vessels within their jurisdiction at outbreak of the war, and that the Resolution of May 12, 1917, should be so interpreted as to harmonize with these rules. They further insist that thus interpreted the Resolution only gave authority to detain and operate the "Antigone " as enemy property, leaving title in the original German owners and the vessel subject to ordinary maritime liens. Our attention is called to the course pursued by the British government and to certain decisions of their courts. *The Chile,* 1 Br. & Col. Prize Cases 1; *The Gutenfels,* 2 *id.* 36; *The Prinz Adalbert,* 3 *id.* 70, 72; *The Blonde,* L. R. (1922) 1 A. C. 313, 334.

---

agency of the Government, to operate, lease, charter, and equip such vessel in any service of the United States, or in any commerce, foreign or coastwise .

SEC. 2. That the Secretary of the Navy be, and he is hereby, authorized and directed to appoint, subject to the approval of the President, a board of survey, whose duty it shall be to ascertain the actual value of the vessel, its equipment, appurtenances, and all property contained therein, at the time of its taking, and to make a written report of their findings to the Secretary of the Navy, who shall preserve such report with the records of his department. These findings shall be considered as competent evidence in all proceedings on any claim for compensation.

Both Great Britain and Germany were parties to Convention VI of the Second Hague Peace Conference, 1907,\* and the action of the former, referred to by counsel, was taken in view of obligations thus assumed. The United States did not approve that convention, and the cited cases involved problems wholly different from the one here presented.

It is unnecessary to consider how far the ancient rules of international law concerning confiscation of enemy property have been modified by recent practices. In the absence of convention every government may pursue what policy it thinks best concerning seizure and confiscation of enemy ships in its harbors when war occurs. The Hague Conference (1907) recognized this and sought by agreement to modify the rule. *The Blonde, supra,* p. 326. Our problem is to determine the result of action taken under a Joint Resolution of Congress whose language is very plain and refers only to enemy vessels. It authorized the President to take "possession and title," and, obeying, he took them. We do not doubt the right of any independent nation so to do without violating any

---

\*Article 1. When a merchant ship belonging to one of the belligerent Powers is at the commencement of hostilities in an enemy port it is desirable that it should be allowed to depart freely, either immediately, or after a reasonable number of days of grace, and to proceed, after being furnished with a pass, direct to its port of destination or any other port indicated.

The same rule should apply in the case of a ship which has left its last port of departure before the commencement of the war and entered a port belonging to the enemy while still ignorant that hostilities had broken out.

Article 2. A merchant ship unable, owing to circumstances of *force majeure,* to leave the enemy port within the period contemplated in the above article, or which was not allowed to leave, can not be confiscated.

The belligerent may only detain it, without payment of compensation, but subject to the obligation of restoring it after the war, or requisition it on payment of compensation.

uniform or commonly accepted rule of international law; and Congress had power to authorize the action irrespective of any general views theretofore advanced in behalf of this government. Certainly all courts within the United States must recognize the legality of the seizure; the duly expressed will of Congress when proceeding within its powers is the supreme law of the land.

*Brown* v. *United States,* 8 Cranch 110, 122—" That war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall chuse to bring it into operation, the judicial department must give effect to its will. But until that will shall be expressed, no power of condemnation can exist in the Court." See *Miller* v. *United States,* 11 Wall. 268; *The Blonde, supra.*

The decree of the court below is

*Affirmed.*