## COMMISSIONER OF INTERNAL REVENUE v. BROWN.

## BROWN v. COMMISSIONER OF INTERNAL REVENUE.

### Nos. 2578, 2583.

Circuit Court of Appeals, First Circuit.

Dec. 17, 1931.

Helen R. Carloss, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, and J. Louis Monarch, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Philip M. Clark and Stanley B. Pierson, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., on the brief), for the commissioner.

James C. Peacock, of Washington, D. C. (C. E. Koss and Proskauer, Rose & Paskus, all of New York City, on the brief), for Jacob F. Brown.

Before BINGHAM, WILSON, Circuit Judges, and MORRIS, District Judge.

WILSON, Circuit Judge.

These are petitions for review of decisions of the Board of Tax Appeals affirming in part a decision of the Commissioner of Internal Revenue assessing the income tax of the partners of Brown & Adams, wool dealers in the city of Boston, for the calendar year of 1918, and overruling the Commissioner in refusing to allow as a deduction to Jacob F. Brown in 1918 the cost of certain Japanese bonds sequestered by the German government during the war as alien enemy property.

The partnership of Brown & Adams was composed of six copartners, each of whom is a petitioner for review, but by stipulation the tax of the other five copartners are to be determined by the decision in the case of Jacob F. Brown, petitioner.

The two cases involve three main issues: First, whether the profits from handling the 1918 wool clip as licensed dealers under certain government regulations was income received in 1918; second, whether certain contingent charges made in 1918 for financing a textile corporation, of which the partnership was a creditor, was income in 1918; and, third, whether certain Japanese bonds belonging to Jacob F. Brown, on being sequestered by the German government in 1918, could properly be treated as a loss within the meaning of section 214(a) (5) of the Revenue Act of 1918 (40 Stat. 1066).

### Wool Profits.

With reference to the issues raised by the profits from handling the wool clip of 1918, the Board of Tax Appeals found the following facts:

"The partnership kept its accounts in accordance with an accrual method. During a part of the years 1918 and 1919 the partnership did business as an approved dealer on a permit issued by the Wool Division of the War Industries Board, as provided in the Board's Regulations of May 21, 1918, said regulations providing among other things that the Government should have a prior right to acquire all of the 1918 wool clip at prices to be officially fixed, plus 4 per cent of

the selling price as compensation for distribution services, and that the approved dealers should sign an agreement that their books would at all times be open to Government inspection, that they would operate subject to the Board's rules, and if at the end of the season it should be found that their gross profits (including the commission) were in excess of 5 per cent of the 'season's business', then such gross profits should be disposed of as the Government decided.

"Upon dissolution of the War Industries Board, December 31, 1918, its powers and functions, including those relating to payments required by regulations affecting the wool clip, were transferred by presidential order to the Bureau of Markets, Department of Agriculture, which on May 20, 1919, announced that the excess profits would be returned to the growers, and expressly prohibited the dealer from undertaking to make any adjustment with the grower, 'no disposition of any excess profits' being authorized until such time as written instructions were given by the chief of the Bureau of Markets.

"The wool clip of 1918, affected by the regulations, referred to wool grown and clipped in that year. Clipping is done from February to the middle of June and the 'season's business' is from spring to spring, the dealer making purchases in the spring for a twelve months' supply, which is ordinarily sold or delivered by the following March or April.

"Brown & Adams made substantial purchases of the 1918 wool clip, not all of which was sold and delivered until April, 1919. The partnership's journal entries of September, 1919, show sales of this clip under eight accounts, which had not closed at the end of 1918, there being a material amount of the wool then unsold. Although the partnership used the inventory method to compute the 1918 profits on wool not here in controversy, it took no inventories of the 1918 wool clip. Data from which such inventories could have been made have been continuously available.

"At the end of 1918 the partnership noted the amount of wool which it had billed to the Quartermaster Corps, entering on its books as its profits for 1918 5 per cent of such business in that year. Further sales of the 1918 clip were made in 1919, and after the eight accounts were closed a new account entitled 'Whom It May Concern' was set up February 24, 1919, composed of the excess profits in the eight accounts from the 'season's business.' In computing these excess profits, the 5 per cent profit allowed by the Government's regulations were subtracted from the net profits and the total of the resulting differences, $253,254.77, was taken to represent the excess profits on the 1918 clip, no matter when sold. The account was set up pursuant to a request from the Bureau of Markets for information concerning the firm's disposition of all wool bought of the clip of 1918. Government auditors later disallowed certain charges taken in connection with the sales, and the account was increased, December, 1919, to $268,947.16.

"Representatives of the War Industries Board orally and later by letters dated December 8 and December 20, 1919, made formal demand upon the partnership for immediate payment of these excess profits. The partnership did not comply, petitioner Brown advising the Government representative that he regarded the pro rata distribution, contemplated by the Government, of the excess profits to the growers as unfair, since some had received 65 cents and some 70 cents a pound for their wool. Brown offered to go over all the partnership's accounts with the individual growers and check up the grading of the wools and the prices realized, and, after working out the amount to which each grower was entitled, to send the Government the partnership's check for the 'Whom It May Concern' account. The Government representative refused to agree to this method.

"The 'Whom It May Concern' account was thereafter taken out of the partnership's books, but later reinstated, being charged back to the partners. The Commissioner refused to regard the entire amount of these excess profits as income in 1919, but divided it between 1918 and 1919, segregating between the two years an amount of $301,922, made up of the $268,947.16 aforesaid, and about $33,000 credited from the interest account to profit and loss. This segregation was made by allocating to 1918 that proportion of the total profits which gross sales for that year was of gross sales for the entire season. The absence of inventories of the 'restricted wool' was given in the agent's report as the reason for this method of allocation."

"On June 2, 1922, the United States filed a suit in the district court for the District of Massachusetts against Jacob F. Brown et al., doing business under the firm name of Brown & Adams, for payment to the plaintiff of $295,051.63 with interest, alleging that defendants became bound to pay plaintiff said sum as excess profits on wool handled by them in 1918 by virtue of the aforesaid Govern-

ment regulations and the defendant's agreement to operate subject thereto. The difference between the amount of the liability as set up on its books by the partnership and the amount for which the Government has brought suit is due to the exclusion by the Bureau of Markets of certain items of cost used by the partnership in computing the excess profits."

If all the wool had been consigned to the dealers under the government regulations, it would have eliminated any excess profits, but the wool growers in general refused to consign their wool to the dealers and trust to the government grading and possible delay in receiving their money. They preferred cash when their wool was delivered to a dealer, or the usual terms of payment. The dealers in the majority of cases proceeded to handle the purchase and collection of the wool as usual, paying the grower whatever price could be agreed upon. The dealers then collected and stored and delivered the graded wool on Quartermaster's orders, and at the price fixed by the government. To protect themselves against government grading and the expense of scouring, shipment, and storage, the dealers made the best bargains they could with the growers. In consequence, Brown & Adams on the 1918 clip netted a considerable sum in excess of the 5 per cent. profit allowed under the regulations of the Board.

In making up their income tax return for 1918, the partners reported as income from handling the 1918 wool clip their proportionate shares of 5 per cent. of the gross sales to the government during that year, or $229,-655.67; that being the maximum amount a dealer was allowed to retain under the regulations of the War Industries Board for his services or profits as an approved dealer.

As a matter of fact the partnership finally received as net profits in handling the wool clip of 1918 over $500,000. Of the wool thus handled by Brown & Adams, only a small amount, seven or eight per cent., was left for disposal in 1919, but the entire profits of the partners were not determinable until 1919.

The partnership, however, on the theory that it was not entitled to any profits over the 5 per cent. on its gross sales, but must return any excess profits to the government to be returned to the growers of whom it purchased the wool, in good faith carried in 1919 the excess profits to an account entitled: "Whom It May Concern."

In 1919, as the Board found, the government made a demand on the partnership for the amount of these excess profits. The partners, on learning of the manner in which the government proposed to distribute this sum, was advised by counsel that it was illegal and might involve them in litigation with the growers, and that it could not be equitably distributed in the manner proposed by the government for reasons set forth in United States v. McFarland (C. C. A.) 15 F.(2d) 823, and United States v. Brown (C. C. A.) 39 F.(2d) 851, which it is unnecessary to repeat here. The partnership thereupon refused to pay to the government the amount it had carried to the account of "Whom It May Concern" until it was determined who was entitled to it, or some equitable method could be devised for its distribution among the growers from whom the partnership had purchased the wool.

The action brought by the government in 1922 to recover of the partnership such excess profits was decided against the government in 1930; United States v. Brown, supra.

The Commissioner in assessing the deficiency tax for 1918 held, and his decision was affirmed by the Board of Tax Appeals, that having received in 1918 under his method of allocation this additional sum of approximately $270,000 as profits from the sale of the 1918 wool clip, it constituted income during that year, notwithstanding at that time the partnership made no claim to it, and, until settled by the suit in 1930, the government insisted that the partnership was not entitled to retain it.

The petitioner, however, now not only contends that the profits received by the partnership in excess of 5 per cent. should not be treated as taxable income until the right to it was determined, but also further contends, notwithstanding the partners returned as income, in 1918, 5 per cent. on its gross sales of wool to the government during that year, that they should not be charged with any income at all in 1918 resulting from the sale of the 1918 wool clip; that the handling of this wool clip should be treated as a single transaction, and as the wool season extends from April to April, and the partnership had not on December 31, 1918, received from the sale of the wool clip of that year the total cost and expenses of handling the entire clip, though as a matter of fact the difference was small, no profits resulted until the cost of the wool and expense of handling had been met, which did not occur until 1919, and therefore he should not be taxed for any income from this source until 1919.

We think the partners were right in including in their tax returns for 1918 their

proportional part of the sum represented by 5 per cent. of the gross sales to the government for that year, and their present contention in this particular cannot be sustained. The profits during the year 1918 of 5 per cent. allowed by the government regulations on the gross sales were readily determinable at the end of the year, and as it was highly improbable that the remainder of the wool on hand January 1, 1919, whether taken by the government or not, would fail to net the partnership sufficient to cover the balance of the cost and expenses of handling, there was not sufficient ground for postponing the determination of their profits of 5 per cent. until the entire 1918 wool clip handled by them was sold, especially since it appears from the record in the case that there was a marked improvement in the wool textile industry in 1919. We think ordinary business judgment would approve the course adopted by the partners in their 1918 return, since their books were kept on an accrual basis.

But we think the government was not entitled to have included in the 1918 return of the partners as income the excess profits above 5 per cent., which the government insisted up to 1930 that the partnership had no right to retain, and to which the partners at that time made no claim, but themselves proposed in 1919 a plan of distributing it among the growers of whom the wool had been purchased and to whom the partners then claimed the excess belonged, and in which plan of distribution they offered to co-operate with the government.

The defense of the action brought by the government does not estop the partners from contending that the profits in excess of 5 per cent. were not income received in 1918. The partners had contended that the government had no right to recover them to be disposed of in the manner proposed, even though the partnership had no right to retain them; and, further, that by reason of the invalidity of the regulations, the government had no right to direct their disposition for any purpose. The petitioner was obliged to defend the action as well as the claim that the excess profits were taxable as income, or take the risk of being compelled to pay a judgment for the full amount as well as the amount of the income tax on the same, if he acceded to the assessment by the Commissioner.

On the other hand, as the court said in R. Hoe & Co. v. Commissioner (C. C. A.) 30 F. (2d) 630, 633: "It is hard to see why one department of the government could not bind another as to the extent of this loss." There appears to be no good reason why the same reasoning does not apply to gains as well as losses. The Bureau of Markets, representing the executive department, having set up the claim that the excess profits did not belong to the partners, "it is hard to see," as the court said in the above case, how such excess profits could consistently be treated as income for another branch of the executive department.

On this branch of the case, the decisions in Frederick McLean Bugher et al. v. Commissioner, 9 B. T. A. 1155; McMurray v. Reynolds (D. C.) 38 F.(2d) 480, 482; Peninsula Shipbuilding Co. v. Commissioner, 9 B. T. A. 189, 203; Ansco Photo Products, Inc. v. Clark (D. C.) 34 F.(2d) 568, 569; Sanford & Brooks Co. v. Commissioner, 11 B. T. A. 452, affirmed Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383; Thorne, Neale & Co., Inc., v. Commissioner, 13 B. T. A. 490, 495; Northwestern Improvement Co. v. Commissioner, 14 B. T. A. 79, 86; Great Northern Railway Co. v. Commissioner, 8 B. T. A. 225, 269, support the petitioner's contention if they are not controlling.

In the last case cited, the Board of Tax Appeals said: "Under either method [that is, cash or accrual] the taxpayer must have before him some definitely ascertained item of income to record before it can be reported and if a given transaction does not correspond to the definition of income then there is no income to record whether the taxpayer keeps its books on a cash or an accrual basis. Where books are kept on the accrual basis there is no requirement that there shall be accrued as income that which may never be received."

It is equally true, we think, that a taxpayer is not required to report as accrued income that which he may never be permitted to retain, because his right to it has not been determined since, "generally speaking, the income tax law is concerned only with realized losses, as with realized gains." Burnet v. Logan, 283 U. S. 404, 413, 51 S. Ct. 550, 553, 75 L. Ed. 1143; Lucas v. American Code Co., 280 U. S. 445, 449, 50 S. Ct. 202, 74 L. Ed. 538.

Again in Peninsula Shipbuilding Co. v. Commissioner, 9 B. T. A. 189, 203, the Board said: "We will consider first the question whether claims made by the petitioner against the Emergency Fleet Corporation for depreciation as an element in determining the cost of the vessels built during the taxable year were accruable items. In numerous appeals

the Board has held that disputed and contested claims not set up on the books of account of taxpayers are not accruable items of income or deductions therefrom until the year of actual settlement."

In McMurray v. Reynolds (D. C.) 38 F. (2d) 480, 482, the court held: "Whatever the rule is in regard to what constitutes income, I think it should be determinable upon the conditions and the circumstances which surround the transaction immediately at the close of the taxable year. If it then is determinable as income, it is likewise taxable; if it is not then determinable as income, it is not taxable, and cannot, on account of conditions growing out of future contingencies, be made taxable."

### Hillsborough Suspense Account.

▆▆▆ As to the $55,650.62 carried in the Hillsborough suspense account in 1918, here again we think the Commissioner and Board erred in holding that the item was income received in 1918. The Board found the following facts:

"The Hillsborough Mills, a New Hampshire corporation, owed the partnership approximately $50,000 in 1908. It developed during the year that the mills, with which the partnership had dealt for two or three years, could not pay its debts, whereupon one of the partners made a careful investigation and found that the only alternatives were to put it out of business or pay its bills and work it out. Petitioner Brown was a personal friend of the principal stockholder of the mills, and believed that with backing its business could be turned ultimately into success. The partnership extended aid, and from 1908 to 1920 completely financed it, paying all its bills for materials and payrolls and furnishing it with money needed. At times it owed over a million dollars to the partnership, which had also the responsibility for its outstanding contracts for wool and other things. All the goods produced by the mills were billed out in its name, but payment was made to the partnership, which kept a running account on which such payments were credited and advances charged, but such credits never equalled the charges for goods and advances.

"Questions of repayment were never discussed, nor was anything paid until 1920. Brown intended to have the company pay the charges if the company were ever put on its feet, and was confident they would be paid if possible. There was no express agreement concerning them. Beginning in 1910 unsuccessful efforts were made almost every year

by the partnership to find someone to take the mills off of their hands.

"The partnership set up a memorandum account on its books under the title of 'Hillsborough Suspense Account', and in it from time to time the various amounts were entered which the partnership intended to charge the mills for its financing if such financing proved successful and if the mills were able to liquidate their indebtedness. Such charges of from one to three cents a pound or sometimes a straight percentage were currently entered from 1908 to 1920 in the partnership books under this suspense account, which was merely tentative and which was never closed prior to the end of 1919, into the profit and loss account of the partnership. Bills showing separately this finance charge among other items were concurrently rendered the Mills during the entire period, and no question was ever made of it. But the suspense account was not included as an asset or a receivable in any statement rendered a banking or commercial-rating house.

"Prior to 1918, $212,591.11 had been carried into this account; during 1918, $55,659.62 was added. By the end of 1919 business in the textile industry had greatly improved following a temporary depression immediately after the close of 1918, and as mills were going ahead in good condition, the amounts which had been entered in the memorandum expense account were credited to profit and loss and reported by the partnership as income in its tax return for 1919.

"In 1920 the partnership included the entire suspense account from 1908 to 1918 inclusive, as income of that year, the account being then settled by promissory notes of the mills subsequently paid."

Prior to 1918, it seems to be conceded by the Board that there was no certainty that the Hillsborough Mills would ever become solvent and pay back the money advanced for operating; to say nothing of any charges for their services in financing. On December 31, 1917, the indebtedness of the company to Brown & Adams for advances was $520,273.16. It is true that at the end of 1918 it appears to have been $433,516.88, and the Board of Tax Appeals in its majority opinion assumes this as a reason for including the financing charges in 1918 of $55,650.62 as income in that year; but the account was continually in a state of flux owing to the fact that money was being advanced from time to time and receipts for the sales of its products were being paid directly to the partnership

and credited on the account. As a result, a reduction in one month might be followed by a substantial increase in the next. In fact, on April 1, 1918, the indebtedness to the partnership was $740,352.08, and it was stated by the witness who had charge of the books and accounts of the partnership that the total charges against the corporation, including the expense account on December 31st, 1919, was $996,818.17, and the photostatic copy of the account bears this out and shows that on that date in the suspense account there were charges of $312,726.89, and in account covering the advances there was due the partnership $684,091.28. In other words, the corporation owed the partnership December 31, 1919, approximately $165,000 more on the advance account than on December 31, 1917, and approximately $250,000 more than on December 31, 1918.

The above figures, together with the fact that by June 20, 1920, the corporation had paid up $706,000 on the indebtedness, supports the contention of the petitioner and the testimony of his witnesses, and also the findings of the Board that the improvement in the textile industry which put this corporation on its feet was not until some time in 1919, and the corporation did not reap the full benefits thereof until 1920.

By June 30, 1920, the account for advances had been reduced to $125,550.01, and in December of that year this sum, together with other bills receivable, and the amount charged for services in financing, was paid, partly in cash and in part by notes, and the suspense account closed.

The Board, as appears above, found as a fact that the financing charges were conditional on the mills again becoming solvent. The charges for advances were quite different from the charges for financing. Brown & Adams advanced cash to operate the mills, and were its unconditional creditor. They were its creditor for their services in financing the mills only in case they were successful in rescuing it from insolvency. Conditional obligations are not income for taxation purposes. Burnet v. Logan, supra; Lucas v. American Code Co., supra. To quote again from Great Northern Railway Co. v. Commissioner, 8 B. T. A. 225, 269: "Where books are kept on the accrual basis there is no requirement that there shall be accrued as income that which may never be received." The charges for financing therefore did not become income until it became certain that the efforts of the partnership had been successful, which the facts found and the record shows was not until 1919 or 1920.

The Commissioner and Board apparently selected the year 1918 as the time when the attempt of Brown & Adams to restore to solvency the corporation succeeded on the ground that the corporation had reduced its indebtedness during that year; but whether it was an actual reduction or would continue to increase, as events proved, was entirely dependent on conditions that did not prove favorable during the later part of the year, and the early part of 1919. It was not until the marked improvement in the textile industry in the latter part of 1919 and 1920 that the financial skies of the corporation cleared and its future solvency became assured. We think the Board on its own findings of fact, viz., that the improvement came in 1919 and followed a depression in 1918, was not warranted in including the item of $55,659.52 in the income of the partners for 1918.

## Japanese Bonds.

In the case of United States v. Brown, the Commissioner appeals from the decisions of the Board overruling the Commissioner in refusing to allow the partners, Jacob F. Brown, to deduct $72,961.83 as a loss in 1918, being the cost of certain Japanese government bonds purchased by him in 1916 and left in the custody of a Berlin bank, and which the German government in 1918 seized as alien enemy property. While the Armistice was signed November 11, 1918, and the bonds were restored to the owner in 1920, the bonds were lost in 1918 as far as the owner was concerned, and there was no certainty at the end of that year that they would ever be restored to him. Peace terms between Germany and the United States were not agreed upon until much later.

The case of United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 47 S. Ct. 598, 600, 71 L. Ed. 1120, seems to support the contentions of the petitioner, in which case the court said:

"The case turns upon the question whether the loss, concededly sustained by the respondent through the seizure of the assets of the German company in 1918, was so evidenced by a closed transaction within the meaning of the quoted statute and treasury regulations as to authorize its deduction from gross income of that year. * * *

"The sequestration of enemy property was within the rights of the German government as a belligerent power and when effect-

ed left the corporation without right to demand its release or compensation for its seizure, at least until the declaration of peace. See Littlejohn & Co. v. United States, 270 U. S. 215, 46 S. Ct. 244, 70 L. Ed. 553; White v. Mechanics' Securities Corp., 269 U. S. 283, 300, 301, 46 S. Ct. 116, 70 L. Ed. 275; Swiss Insurance Co. v. Miller, 267 U. S. 42, 45 S. Ct. 213, 69 L. Ed. 504; Stoehr v. Wallace, 255 U. S. 239, 242, 244, 41 S. Ct. 293, 65 L. Ed. 604; Central [Union] Trust Co. v. Garvan, 254 U. S. 554, 41 S. Ct. 214, 65 L. Ed. 403; Brown v. United States, 8 Cranch, 110, 122, 3 L. Ed. 504. *What would ultimately come back to it, as the event proved, might be secured not as a matter of right, but as a matter either of grace to the vanquished or exaction by the victor. In any case the amount realized would be dependent upon the hazards of the war then in progress.* * * *

"The quoted regulations, consistently with the statute, contemplate that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment. It would require a high degree of optimism to discern in the seizure of enemy property by the German government in 1918 more than a remote hope of ultimate salvage from the wreck of the war. The taxing act does not require the taxpayer to be an incorrigible optimist.

"We need not attempt to say what constitutes a closed transaction evidencing loss in other situations. It is enough to justify the deduction here that the transaction causing the loss was completed when the seizure was made. It was none the less a deductible loss then, although later the German government bound itself to repay and an award was made by the Mixed Claims Commission which may result in a recovery." (Italics supplied.)

The fact that the Japanese government was the petitioner's debtor when the only evidence of its indebtedness had been seized under the rights of belligerents during a state of war, and had become the property of the German government, and the only chance of its being restored to the taxpayer was either "a matter of grace to the vanquished or reaction by the victor," can hardly serve to differentiate the case of United States v. S. S. White Dental Mfg. Co., supra, from this. Whatever doubts there may be on this and the other issues first considered, should be resolved in favor of the taxpayer. Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211.

In No. 2578, decision of the Board of Tax Appeals is affirmed.

In No. 2583, the decision of the Board of Tax Appeals is reversed, and the case is remanded to that Board for further proceedings not inconsistent with this opinion.