## SUSPINE et al. v. COMPANIA TRANSATLANTICA CENTROAMERICANA, S. A., et al.

District Court, S. D. New York.

Dec. 6, 1940.

See, also, 37 F.Supp. 268.

Herbert J. De Varco, of New York City, for libellants.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of

counsel), for respondent Arnold Bernstein Shipping Co. Inc.

Adolph Finkelstein, of New York City (Sydney Saxon, of New York City, of counsel), for respondent Compania Trans-atlantica Centroamericana, S. A.

HULBERT, District Judge.

Two interesting questions are presented by these cross motions: The more important one is whether citizens of the Philippine Islands may be debarred, under the provisions of the Neutrality Act of 1939, 22 U.S.C.A. §§ 245j to 245j—19, from serving as seamen on a vessel of foreign registry clearing from a port of the United States; the other is, to what extent *exceptive* allegations may be employed to bring before the court facts not found within the four corners of the libel, in an attack upon its legal sufficiency.

The Treaty of Peace between the United States and Spain authorized the Congress to determine the civil rights and political status of the native inhabitants of the Philippine Islands, and the Act of July 1, 1902, 32 Stat. 691, declared that all inhabitants continuing to reside therein who were Spanish subjects on April 11, 1899, and then residing in the Islands, and their children born subsequent thereto, "Shall be deemed and held to be citizens of the Philippine Islands and as such entitled to the protection of the United States, except such as shall have elected to preserve their allegiance to the Crown of Spain" according to the Treaty.

Citizens of the Philippine Islands are not aliens. Gonzales v. Williams, 192 U.S. 1, 13, 24 S.Ct. 177, 48 L.Ed. 317. They owe no allegiance to any foreign government and were not eligible for naturalization until the Act of 1906, 34 Stat. 606, § 30, 8 U.S.C.A. § 360.

They have been no less favorably dealt with than the American Indians whom Attorney General Cushing classified as "subjects" (Op.Atty.Gen.1855, page 746), but the courts held to be "wards". United States v. Kagama, 118 U.S. 375, at page 383, 6 S.Ct. 1109, 30 L.Ed. 228. The Filipinos are at least destined for a greater independence and freedom.

The status of the Filipinos has been variously affected by Acts of Congress such as "The Alien Registration Act, 8 U.S.C.A. §§ 137, 155, 156a, 451–460; The Immigration Act, 8 U.S.C.A. §§ 203, 215; The National Fire-arms Regulations, 15 U.S.C.A. §§ 901–909; The Selective Service Act, 50 U.S.C.A.Appendix § 301 et seq.; and the Merchants Marine Act of 1936, 46 U.S.C.A. § 1101 et seq.", setting them apart and placing them in a category peculiar to themselves.

The Constitution of the Philippines, adopted February 8, 1935, and approved by the President of the United States by Proclamation on March 23, 1935, provides in an Ordinance annexed thereto, as follows: "Section 1. Notwithstanding the provisions of the foregoing Constitution, pending the final and complete withdrawal of the sovereignty of the United States over the Philippines—(1) All citizens of the Philippines shall owe allegiance to the United States." 30 Philippine Pub. Laws, p. 386.

It is the contention of the libellants that Filipino seamen can neither serve upon vessels of American registry or vessels of foreign registration whose destination is within the combat area defined by the President of the United States pursuant to the Neutrality Act of 1939, and hence the constitutionality thereof is brought into question.

On October 25, 1940, pursuant to Sec. 401, Title 28 U.S.C.A., notice of the pendency of this action was given to the Honorable, the Attorney General of the United States, and he, through the United States Attorney for the Southern District of New York, has interpleaded.

Admiralty Rule 27, 28 U.S.C.A. following section 723, provides: "Either party may except to the sufficiency, fullness, distinctness, relevancy or competency of any of the pleadings or interrogatories filed by the other party; and if the court shall so adjudge on a hearing on the exceptions, and shall order further pleadings or answers to be filed by either party, such pleadings or answers shall be filed within such time and on such terms as the court may direct."

Exceptions to a pleading in Admiralty perform the functions of a demurrer (The Underwriter, D.C., 6 F.2d 937, reversed on other grounds, 2 Cir., 13 F.2d 433, affirmed Maul v. United States, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171; The Vema, D.C., 27 F.Supp. 679); they admit facts well pleaded (The Fred E. Sander, D.C., 212 F. 545; The Augustine, D.C., 8 F.2d 287; The Senator, D.C., 54 F.2d 420; The Blue Mountain, D.C., 20 F.Supp. 165), and the libel is to be very liberally con-

strued. The Underwriter, supra; the Nesco, D.C., 47 F.2d 643.

There is no authorization by statute or rule for exceptive allegations but the earliest sanction for their use in Admiralty is to be found in United States v. Four Hundred Twenty-Two Casks of Wine, 26 U.S. 547, 550, 1 Pet. 547, 550, 7 L.Ed. 257 (Story, Justice).

In The Seminole, D.C., 42 F. 924, an exceptive allegation attached to exceptions to the libel was held to be proper procedure to bring before the court "facts judicially known to the court". See also The West Keats, 1923 A.M.C. 1092; The Volsinio, D.C., 32 F.2d 357. Compare The Murray Glen, 1938 A.M.C. 1073.

Judge Nelson recognized the propriety of embracing a plea to the jurisdiction in the answer and the taking of testimony thereunder to "show that the tug was seized outside of the jurisdiction of this court" (The Lindrup, D.C., 70 F. 718, 719); but it has since been held that the better practice is to file separate exceptions before answer (The Elisabeth Van Belgie, D.C., 248 F. 1006), and in this district our local Admiralty Rule 14 so requires.

The procedure followed in The Seminole, supra, was approved in The John K. Gilkinson, D.C., 150 F. 454, although the exceptions and exceptive allegations were overruled in that case. And the practice has been permitted in the absence of objection. Pfeil v. United States, D.C., 287 F. 265. It was, however, regarded with disfavor in The Henry S. Grove, D.C., 283 F. 1019, but the weight of authority encourages the practice of filing of exceptive allegations.

In Standard Wholesale P. & A. Works v. Travelers Ins. Co., 4 Cir., 107 F.2d 373, at page 376, Northcott, C.J., said: "the greater weight of authority is to the effect that the judge may, in his discretion permit the filing of exceptive allegations under circumstances similar to those existing here."

In The Grasselli Chemical Co. No. 4, D.C., 20 F.Supp. 394, which involved the amendment of June 5, 1936, to Section 185 of Title 46 U.S.C.A. reducing to six months the time within which the vessel owner may limit liability, the Court sustained what were in effect, although not so designated, exceptive allegations and, in The Irving, 1939 A.M.C. 825, likewise dealt with a similar situation.

In cases relating to bills of lading, however, the court seemed prone to follow the Grove case, supra. The Haiti, 1938 A.M.C. 895, 896; The President Taft, 1938 A.M.C. 1090.

See also, Independent Transp. Co. v. Canton, Ins. Office, D.C., 173 F. 564 (breach of warranty of insurance policy), and United States v. Alex Dussel Iron Works, 5 Cir., 31 F.2d 535 (the defenses of laches— unless as a matter of law it appears on the face of the libel).

The Admiralty practice is liberal. Admiralty Rule 44 provides: "In suits in admiralty in all cases not provided for by these rules or by statute, the District Courts are to regulate their practice in such a manner as they deem most expedient for the due administration of justice, provided the same are not inconsistent with these rules."

In liberalizing the Civil Rules, the United States Supreme Court provided in Rule 81, Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c: "These rules do not apply to proceedings in admiralty." And Alaska Packers Ass'n v. Pillsbury, 301 U.S. 174, 57 S.Ct. 682, 81 L.Ed. 988, seems to indicate the distinction. But the liberality of the Admiralty practice is emphasized in The Henry S. Grove, D.C., 287 F. 247, where the court said there was nothing in the rules to show that it was intended to deny the right of either party to require disclosure of matters touching the case or defense of the opposite party.

While these observations are foreign to the matter of exceptive allegations, reference thereto is made to further emphasize that the method of dealing with exceptive allegations is a matter for the exercise of sound judicial discretion as authorized by the liberal practice permitted under Rule 44, supra.

It is undisputed in this case that the 53 libellants are seamen, and citizens of the Philippine Islands. Compania Transatlantica Centroamericana, S. A., is a corporation organized under the laws of Panama, and Arnold Bernstein Shipping Company is alleged in the alternative to be a New York corporation or a foreign corporation; each of the respondents having an office for the regular transaction of business in this district.

On or about May 5, 1940, the libellants signed regular shipping articles at the

Port of Newport News, Va., before the Consul of the Republic of Panama, and in his office, to engage in the service of the S/S Panamanian for a voyage from said port to foreign ports in England for a period not to exceed six months, at stipulated wages; respondent Compania owned, and respondent Bernstein operated and managed, the S/S Panamanian, registered under the laws of the Republic of Panama.

The libel alleges that on the 5th day of July, 1940, the libellants were unlawfully and illegally discharged by the respondents and evicted from said vessel.

Two causes of action are set up, one to recover damages for breach of contract from the date of said alleged discharge, and the other, to recover wages for overtime services in accordance with said contract of employment. Each respondent excepts on the general ground that the facts alleged in the libel are insufficient in view of the provisions of the Neutrality Law of 1939, Title 22 U.S.C.A. §§ 245j to 245j—19, and the respondent Bernstein adds an additional exception that it appears on the face of the libel that the alleged contract, on which suit is based, was executed by the respondent Compania, as owner, and that the functions of respondent Bernstein were limited to those of operator and manager.

*The exceptive allegations* allege the issuance by the President of the United States under the Neutrality Act, of a proclamation that a state of war exists between Germany and France; Poland; and the United Kingdom, India, Australia, Canada, New Zealand and the Union of South Africa, and defining combat areas affecting all of the waters adjacent to the British Isles, into or through which no American citizen or any American vessel may proceed, except under such rules and regulations as may be prescribed. The exceptive allegations then recite that under the Neutrality Act of 1939, the United States, when used in a geographical sense, includes among its insular possessions the Philippine Islands, and that the term "citizen" includes any individual owing allegiance to the United States, and then proceeds to set forth the proceedings which have been taken to effectuate the ultimate independence of the Philippine Islands, and alleges that all citizens thereof in the meantime owe allegiance to the United States, and the libellants are, therefore, within the meaning of the word "citizens" as used in said Neutral-

ity Act, and that by reason thereof the Collector of the Port of Baltimore, Md., refused clearance to the vessel, and hence the contract is null and void and of no effect.

The respondents did not apply to the court for leave to serve exceptive allegations and the only action taken by the libellants was a cross motion to strike them out after the respondents had brought on motions to argue them.

In the affidavit upon which the libellants' notice of motion was based, their proctor said:

"The Neutrality Act is not at all applicable to the instant case. There is no admission that any order was given by the Customs Officials in Baltimore, refusing clearance to the vessel. * * *

"Your deponent further submits that there are other factors which enter into the alleged discharge of the libellants in the Port of Baltimore. It is alleged that the reason for their discharge may not be any involvement under the Neutrality Act, but rather an attempt by the respondents to discharge the Filipino crew and substitute in their place another crew whose rate of pay was considerably less than that agreed to be paid to the Filipino seamen.

"There is also a question as to whether they were not discharged because of the sinking of the vessel at its dock in Baltimore and charges of sabotage being made."

In opposition to the motion of the libellants, the respondent Compania submitted a photostatic copy of a letter from the Assistant Collector of the Port of Baltimore, enclosing a certificate which reads as follows:

"Treasury Department
"United States Customs Service
"Baltimore, Md.
"August 28, 1940.

"To Whom It May Concern:

"This is to certify that on June 29, 1940, the Master of the Panamanian S/S Panamanian applied to this office for clearance of the vessel to Liverpool, England, and clearance was refused because of the presence on board of Filipino seamen, who were prohibited from making such a voyage by the Neutrality Act of 1939, and by the Regulations of the Department of Commerce.

"It is further certified that clearance was granted to the vessel on July 3, 1940, when

this office was satisfied that there were no persons on board who were prohibited by the Neutrality Act of 1939 from making the voyage in question."

Also a photostatic copy of a letter from the Assistant to the Legal Adviser of the Secretary of State of the United States, which reads as follows:

"Department of State
"Washington
"August 19, 1940.

"My dear Mr. Finkelstein:

"The Department has received your letter of August 13, 1940 referring to the employment of Philippine citizens on vessels traveling between the United States and ports in England and Ireland. You ask to be advised whether such persons are prohibited from traveling in danger zones by the Neutrality Act.

"Section 3 of the Neutrality Act of 1939 makes it unlawful for citizens of the United States to proceed into or through any combat area defined by the President under the authority of that section. England and Ireland are in combat areas defined by the President, so that citizens of the United States are prohibited from entering such areas except when in possession of American passports validated for that purpose. Such passports are not being issued to members of the crews of vessels proceeding into combat areas. Section 16 of the Neutrality Act defines the term 'citizen' as any individual owing allegiance to the United States, which would include citizens of the Philippine Islands."

These are certainly not matters within the knowledge of the court. Are they facts of which the court may take judicial knowledge? Do they eliminate the consideration of any other circumstances responsible for the discharge of the libellants?

A suit in Admiralty was filed in this court by L. Littlejohn & Co., Inc., v. United States of America, on February 19, 1921. The libel alleged that the United States owned, operated or controlled the steamship "Antigone" (ex "Neckar") which on October 9, 1919, was outbound from the Port of New York and collided with the inbound Steamship "Gaelic Prince" in the Ambrose Channel. Littlejohn owned cargo aboard the "Gaelic Prince" and sought $190,000 for damage thereto. The United States Attorney, appearing specially, filed "suggestions of want of jurisdiction" and

notice of hearing thereon. This presented an allegation that the North German Lloyd liner "Neckar" had taken refuge in a port of the United States prior to the declaration of war by the United States (April 6, 1917) and that by Act of Congress May 12, 1917, 40 Stat. 75, the President was directed to take over to the United States the possession and title of any vessel within the jurisdiction thereof, which at the time of coming into such jurisdiction was owned in whole or in part by any corporation, citizen, or subject of any nation with which the United States might be at war, or was flying the flag of or was under register of such nation or political subdivision or municipality thereof, which he did by Executive Order dated June 30, 1917, and thereafter the United States, as owner, operated the vessel, the name of which had been meanwhile changed to "Antigone", and by reason of such operation at the time of collision no suit would lie. 65 additional causes arising out of said collision were consolidated with the Littlejohn suit and pursuant to an order of the court an amended libel was filed in the consolidated cases, and by a further order the "suggestions of want of jurisdiction" were permitted to stand. The libellants filed exceptions and answer, or traverse, to the suggestions of want of jurisdiction, and the matter came on before the late Judge Hough, who, in an opinion dated September 29, 1922 (Unreported—Clark's file A77–57), said:

"The Court may entertain the belief (I do) that it is almost matter of public knowledge as to just how this vessel came into the possession of the United States, what had been done with her and for what she was being used when in collision with the Gaelic Prince.

"The Court may believe (as I do) that the single and ultimate question here is whether vessels with the Neckar-Antigone's history could be said to be within the meaning of the law vessels belonging to the United States or public vessels of the United States.

"But I am not authorized to take judicial cognizance of this matter, and I am persuaded that the documents and affidavits submitted on the suggestion-hearing, do not and cannot tell the whole story. I should want to know what the United States had done to the vessel, whether it had been re-built and re-conditioned, how it was manned and especially what if any

steps had been taken by the original private German owner to maintain or reassert any claim of ownership in the original Neckar. In short, I do not think that a sufficient ground-work is laid for the argument made at bar.

"The practice of making suggestions like this has undoubtedly grown. It seems to me it is bad practice. In this action in personam the same issues could (and I think should) have been raised by an answer containing exceptions, or rather exceptive allegations; then a preferential trial could have been asked on the exceptive allegations relating to jurisdiction."

What Judge Hough did was to make an order, in effect, framing specific issues. A trial was had before Judge A. N. Hand, then in the District Court, and the order made by him dismissing the libel was affirmed upon direct appeal to the United States Supreme Court. L. Littlejohn & Co. v. United States, 270 U.S. 215, 46 S. Ct. 244, 70 L.Ed. 553.

While I take the more liberal view with respect to the employment of exceptive allegations, I feel, upon the issues as so far presented in this particular case, that libellants should have an opportunity to meet the exceptive allegations if they so desire. If a proper pleading to attain this result is not filed in this court, and a copy thereof served upon the proctors for the respective respondents, within ten days, the court will proceed to dispose of the case upon the papers before it; if the traverse be filed, subject to the consideration of its legal sufficiency, an order will be made providing for an early hearing of the complete issues thereby raised.